# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-3694

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Minnesota. |
| | * | |
| Juan Mederos Gomez, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  June 14, 2002

Filed:  December 11, 2002

_____

Before HANSEN, Chief Judge, BOWMAN and BYE, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Juan Mederos Gomez appeals from the order of the District Court[1] denying his motion to suppress.  We affirm.

The only witness to testify at the hearing on Gomez's motion was Daniel Medrano, at the time a ten-year veteran of the United States Postal Inspection Service

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the Honorable E.S. Swearingen, United States Magistrate Judge for the District of Minnesota.

and a prohibited mailings narcotics specialist in Indianapolis, Indiana. Early in the morning on Saturday, April 28, 2001, a drug interdiction operation involving forty postal inspectors and ten national guardsmen, all trained in spotting suspicious packages, was ongoing at the United States Postal Service (USPS) Express Mail hub in Indianapolis. The package in question arrived between 2:00 and 2:30 a.m. An unidentified inspector removed the package from the conveyor belt in the area where the packages were sorted for transfer to their final destinations and brought it, along with others, to Medrano at the "command center," approximately twenty yards from the belt, for further inspection.

Medrano observed that the package was sent by Express Mail for delivery by noon the next day to a "Juan Mederos" at a Minneapolis address. Medrano testified that Express Mail next-day noon delivery is favored for the transport of contraband, notwithstanding the greater expense compared with regular mail (or even Express Mail two-day delivery or next-day 3:00 p.m. delivery), because it is reliable and trackable, and obviously faster. Medrano found the package's size—approximately fourteen inches square and nearly twelve pounds—to be unusually large for person-to-person mail, as the hand-written label indicated it was. He testified that only five percent of Express Mail is not business-related and personal Express Mail packages are typically much smaller than those for which the sender or recipient is a business. The size of the package was further significant because, in Medrano's experience, illegal drugs are often sent through the mail enclosed in larger items. The cost for mailing the package was $37.55, relatively expensive, especially for mail not sent by a business, and the sender paid the postage in cash.

The package was mailed on Friday for delivery on Saturday. Medrano testified that he had been seeing more illegal drugs in parcels mailed Friday for Saturday delivery and believed that this was because drug dealers speculated that fewer drug interdiction efforts were being conducted on weekends. The package was mailed from LaBrea, California, near Los Angeles, a known source city and state for illegal

drugs. Medrano noticed that the package was heavily taped, possibly an attempt to thwart a drug-detection dog. His attention also was drawn to a "FRAGILE" stamp on the package and to the fact that the sender and the addressee had the same surname (presumptively relatives). In Medrano's experience, both of these factors reflected an attempt to "legitimize" the package. The sender's first name was spelled "Antony," which Medrano suspected was a misspelling of "Anthony" and so perhaps not the sender's true name. Medrano decided to detain the package for further investigation.

Medrano's intention was to verify the addresses of the sender and the addressee at the earliest opportunity. He spoke with the mail carriers assigned to the routes in Minneapolis and LaBrea when they arrived for work, after 7:00 a.m. local times. Although the addresses were valid, the carriers were unable to associate the names of the sender and the intended recipient with the addresses written on the label. The package was then subjected to a canine sniff by Wendy, a certified drug-detection dog, who alerted to the package. The "Juan Mederos" package was one of thirty (out of thirty-five that had been detained) to which drug-sniffing dogs alerted that morning. Medrano prepared a search warrant application and delivered it to the home of a United States magistrate judge, who authorized the warrant at 5:17 p.m.

The package was opened and found to contain nine pounds, three ounces of methamphetamine. Gomez accepted the package in Minneapolis in a controlled delivery on Monday, April 30, 2001. He was charged in two counts with federal drug violations. After the District Court denied his motion to suppress the methamphetamine, Gomez entered a conditional guilty plea, was sentenced, and filed this appeal.

We review de novo the District Court's conclusions regarding reasonable suspicion and probable cause. Ornelas v. United States, 517 U.S. 690, 699 (1996). On the other hand, we "review findings of historical fact only for clear error

and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Id.

Gomez first argues that the package was seized without reasonable suspicion to believe it contained contraband, and therefore in violation of the Fourth Amendment, when it was lifted from the conveyor belt by an inspector. Assuming the inspector who picked up the package did not have the necessary reasonable suspicion, the question is whether there was a seizure—"meaningful interference" with Gomez's "possessory interests" in the package. United States v. Jacobsen, 466 U.S. 109, 113 (1984). We have recently held in a very similar case that the lifting of a package from a FedEx conveyor belt by a drug interdiction officer was not a seizure in the constitutional sense, and so reasonable suspicion was not required. United States v. Demoss, 279 F.3d 632 (8th Cir. 2002). Such is the case here. The large, heavily-taped Express Mail package, voluntarily deposited in the mail in California for delivery by the USPS hundreds of miles away in Minnesota, virtually begged for the attention of a postal inspector. It is not reasonable for Gomez to have expected this particular package—or any package, for that matter—to make its way through the USPS system with its exterior characteristics unnoticed. See id. at 635 ("[T]here could be no expectation that [a FedEx] package would not be handled or that its physical attributes would not or could not be observed."); see also Walter v. United States, 447 U.S. 649, 655 n.5 (1980) (quoting a passage from a seminal case where the Court noted that the "outward form and weight" of sealed, first-class mail was not protected under the Fourth Amendment from examination by authorities) (Stevens, J., announcing the judgment of the Court) (citation to quoted case omitted).

We further conclude that moving the package twenty yards away from the conveyor belt for some moments (as contrasted with the package at issue in Demoss, which was not moved any appreciable distance from the belt before reasonable suspicion was established) was minimal interference with Gomez's possessory interest

in the package.[2]  When the package was taken to the command post, away from the normal activity near the conveyor belt but still within the confines of the processing center, it was merely "stopped," and reasonable suspicion was not required for that stop.  See Terry v. Ohio, 392 U.S. 1 (1968).  It was not seized until Medrano opted not to return it to the conveyor belt for transfer to its intended destination, that is,

---

[2]As we noted above, this Court held that the FedEx package in question in Demoss was not seized when it was lifted from the conveyor belt in the sorting area of the FedEx facility.  United States v. Demoss, 279 F.3d 632, 635-36 (8th Cir. 2002).  The Court further held that because of the package's particular and readily observable external characteristics, reasonable suspicion was established almost immediately when the package was picked up.  Id. at 636.  The exact moment at which the package was seized therefore became immaterial to the holding.  The Demoss Court's statement that the package was seized when the officer took it away from the belt was dictum—not a holding of the case—because it was not essential to the resolution of the legal issues raised by the appellant.  That statement did *not* establish a rule that, for Fourth Amendment purposes, a package examined at a sorting facility is seized when it is taken away from a sorting area for further inspection.  Indeed, a comparison of the facts relating to the seizure in Demoss and to the seizure in this case demonstrates the wisdom of the Supreme Court's teachings that the fact-intensive nature of Fourth Amendment inquiries makes the promulgation of bright-line rules ill-advised.  See United States v. Drayton, 122 S. Ct. 2105, 2111 (2002) ("[F]or the most part *per se* rules are inappropriate in the Fourth Amendment context."); see also infra p. 8.  The fact that the FedEx package was taken away from the conveyor belt was no more determinative of the question of seizure in Demoss than the Express Mail package's twenty yards' distance from the sorting area for further visual inspection by Medrano is determinative of a seizure in this case.  In each case, there was no seizure until the respective officers exerted dominion and control over the packages by deciding to go beyond a superficial inspection of the exterior of the packages and to detain the packages for further inquiry into characteristics that could not be observed by merely holding the package.  See United States v. Jacobson, 466 U.S. 109, 121 n.18 (1984).

until he "exert[ed] dominion and control over the package for [his] own purposes."[3] Jacobsen, 466 U.S. at 121 n.18.

We also reject Gomez's alternate argument that even if we hold (as we have) that the package was seized only after Medrano had a look at it and not when it was removed from the conveyor belt, the seizure was not supported by reasonable suspicion. We do not know why the first inspector to handle the package lifted it from the belt, so we cannot say that he immediately formed a reasonable suspicion that the package contained contraband. But as we explain below, we do know why it attracted Medrano's attention, and we conclude that by the time the package was seized, Medrano had reasonable, articulable suspicion to do so.

The characteristics of the package described by Medrano in his testimony at the suppression hearing, which we have detailed supra, when combined with his undisputed knowledge and experience in the interdiction of packages containing illegal drugs, clearly demonstrate that Medrano had formed the reasonable suspicion necessary to detain the package. See United States v. Arvizu, 122 S. Ct. 744, 750 (2002) ("When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized

---

[3]As a result of Medrano's inspection of the package, or perhaps because of the subsequent detention of it, the package missed the flight, which departed Indianapolis at approximately 2:30 a.m. on Saturday morning, that would have arrived in Minneapolis in time for the package to be delivered to "Juan Mederos" before noon. It is unclear at precisely what point in the inspectors' review of the package the connecting flight left for Minneapolis. Medrano answered in the affirmative when asked if the "package was missing the plane" when the decision was made "to check further on the package." Hearing Transcript at 38. In other words, it may have missed the connection before Medrano even had a chance to look at it.

and objective basis' for suspecting legal wrongdoing.") (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). Gomez contends that the factors cited by Medrano might just as easily have been noted on an altogether innocent package. "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct. Undoubtedly, each of these factors alone is susceptible to innocent explanation, and some factors are more probative than others." Id. at 753 (citation omitted). But the historical facts of this case considered in light of the background facts—that is, viewed "through the lens of [Medrano's] experience and expertise" as a postal inspector—clearly add up to reasonable suspicion. Ornelas, 517 U.S. at 699; cf. United States v. Johnson, 171 F.3d 601, 604 (8th Cir. 1999) (reversing the denial of a suppression motion where "there was no articulation of how the officer's experience bore upon his appraisal of the package in light of the profile"). The features observed by Medrano have been considered relevant and probative by this and other courts of appeals when evaluating reasonable suspicion. See, e.g., Demoss, 279 F.3d at 635-36; United States v. Scarborough, 128 F.3d 1373, 1378 (10th Cir. 1997); United States v. Dennis, 115 F.3d 524, 532 (7th Cir. 1997). In some cases such reasonable suspicion has been found where far fewer of the "profile" characteristics were noted. Given Medrano's interdiction experience, the factors present here "sufficed to form a particularized and objective basis for" the package to be detained for further investigation. Arvizu, 122 S. Ct. at 753. The seizure of the package was constitutionally reasonable.

A seizure properly supported by reasonable suspicion nevertheless may by its "nature and extent" cross over to become an unreasonable intrusion upon Fourth Amendment rights, in which case the detention would be unconstitutional in the absence of probable cause. Demoss, 279 F.3d at 636 (quoting United States v. Place, 462 U.S. 696, 705 (1983)). Although Gomez does not specifically challenge the reasonableness of the detention after the package was seized, out of an abundance of caution and in order to round out our discussion, we will address the issue.

It may have been as long as twelve to fourteen hours between the time reasonable suspicion was established (Medrano's cumulative observations, taking into account his professional training and experience) and the time probable cause was clearly demonstrated (Wendy's alert to the package, <u>see</u> <u>United States v. Sundby</u>, 186 F.3d 873, 876 (8th Cir. 1999)). We know it was approximately fifteen hours after the package arrived in Minneapolis that the search warrant was approved by the magistrate judge. But to our knowledge, no court has set a limit on the amount of time that a package deposited into the USPS Express Mail system may be held where reasonable suspicion that is less than probable cause has been established. And it is our opinion that setting an outside limit, a bright-line rule, would be a mistake. <u>See</u> <u>United States v. Drayton</u>, 122 S. Ct. 2105, 2111 (2002) ("[F]or the most part *per se* rules are inappropriate in the Fourth Amendment context."). We take that position in part because the length of the detention must be considered in light of the amount of time reasonably required for a diligent inspector to complete an investigation into the package being held, <u>see</u> <u>Place</u>, 462 U.S. at 709, and that will vary with each case.

It is undisputed in this case that Medrano attempted to verify the addresses as soon as possible. Because the seizure occurred in the wee hours of the morning in Indianapolis, soon after the package arrived at the Express Mail hub, and because the sender's address was in California, there was no practical way to check that address until approximately eight hours after the package arrived. Once that step was taken, Wendy, whose reliability as a drug-detection dog is unchallenged, was called in. When she alerted to the package, there was probable cause to support the issuance of a search warrant. <u>See</u> <u>Sundby</u>, 186 F.3d at 876 ("A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable."). The record demonstrates that Medrano acted as expeditiously as the circumstances would allow to establish and document the facts necessary to support a lawful search and to apply for a warrant. We cannot say that the intrusion upon the legitimate expectations of Gomez in the interim between reasonable suspicion and probable cause was unreasonable.

The District Court's denial of Gomez's suppression motion is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.