# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3389

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Todd John Lakoskey, | * |
| | * |
| Appellant. | * |

Appeals from the United States
District Court for the
District of Minnesota.

_____

No. 05-3390

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Thomas James Lakoskey, | * |
| | * |
| Appellant. | * |

_____

Submitted:  May 16, 2006
Filed:  September 14, 2006 (Amended 10/31/06, 11/06/06)

_____

Before BYE, HANSEN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Brothers Thomas and Todd Lakoskey were each convicted of conspiracy to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. Thomas was sentenced to 240 months' imprisonment; Todd was sentenced to 151 months' imprisonment. On appeal, both challenge the denial of their motions to suppress and the admission of evidence under Federal Rule of Evidence 404(b) during trial. Todd also challenges his sentence. For the reasons stated below, we affirm in part and reverse in part.

## I. *Factual Background*
### A. *Thomas Lakoskey*

On January 7, 2004, Postal Inspector Larry Hirose of the United States Postal Service (USPS) went to the doorstep of Thomas's residence at 7454 East Natal Drive, Mesa, Arizona, to deliver an Express Mail package. Hirose decided to deliver this package personally because he noticed something at the local mail sorting facility that made him believe the package was "suspicious." (Tr. 32) Hirose claimed he was suspicious of the package because "some things on the address label looked strange . . . In this case sloppy handwriting, that appeared to be a misspelled name on the return address, a different signature on the signature waiver line . . . different than the sender's name." *Id.* at 33. Hirose was accompanied by three plain-clothes deputies from the Maricopa County Sheriff's Department.

The front entrance to the house is a combination of two doors: a security door, which is a lattice of metal bars, in front of a solid door. When the officers approached, the exterior security door was closed, but the interior solid door was open. Hirose yelled through the security door into the house to announce himself. When Thomas appeared, Hirose asked him to sign for the parcel. Hirose suspected drug use based on Thomas's appearance. Thomas signed the delivery receipt for the parcel. After Thomas signed for the package, Hirose showed Thomas his badge, stating, "I'm with the Postal

Inspector Service, we have some concerns about this package today." *Id*. at 43. He asked Thomas " . . . if we could maybe look in the package to see what's inside of it." *Id*. at 44. According to Hirose, Thomas's demeanor abruptly changed; he took the package from Hirose and walked into the house. As he did, he said, "I'm not going to tell you what's inside, get out of here . . . ." *Id*. at 45. Thomas slammed the security door behind him and went into his house. Hirose followed Thomas but stopped on the landing just outside the security door. Hirose could still see Thomas through the security door. Hirose acknowledged that Thomas had a right to take the package after signing for it.

Hirose continued to talk to Thomas through the closed door, despite being asked to leave. He explained that "we just want to make sure there was nothing hazardous in there or illegal, anything dangerous that he was receiving." *Id*. at 46. Hirose stayed outside and continued repeating his request to open the envelope. Thomas began yelling at Hirose in an agitated manner, telling him to "get the hell out of here" and "it's my money." *Id*. Hirose did not leave. At some point, Thomas said, "I'll open it." *Id*. at 49. When he began opening the envelope, he turned and walked outside of Hirose's view. Hirose opened the front door and entered the house to stop him. Hirose told Thomas, "[I]f you're going to open that, I'd like you to open it in front of me . . . ." *Id*. at 50. Thomas became visibly upset with Hirose in his kitchen and began mumbling or muttering to himself. He then opened the envelope in front of Hirose.

Hirose admitted that Thomas never explicitly invited him into his house. Nonetheless, Thomas opened the package in front of Hirose and showed him the contents. It contained a *People* magazine with the pages taped shut with white tape. Hirose told Thomas, "It's a magazine, Tom, but we need to know what's inside." *Id*. at 55. Thomas removed $4,000 from between the pages of the magazine and $3,000 from a white, letter-sized envelope. Thomas asked if it was illegal to send cash through the mail. Hirose told him that it was not illegal but told him ". . . it's typical

for narcotics proceeds to be packaged that way . . . ." *Id*. at 57. Hirose explained to him two or three times that it just raised a lot of suspicion and a lot of questions because of the way it was packaged. Hirose then confiscated the money. The remaining two deputies entered the house and walked through the kitchen and into the living room. Hirose told Thomas that he was not under arrest but took the money and the envelope outside of the house and gave it to Deputy Borland. Deputy Borland secured the money in his squad car and entered the house. During this time, the officers told Thomas that they suspected that his house was used as a laboratory to make methamphetamine. None of the police officers asked for or were given permission to enter the house.

At this point, Thomas consented to let officers search his house. During the search of the house, officers found a small amount of methamphetamine and drug paraphernalia in the bedroom belonging to Thomas's house guest, Joseph Zyanjar. Zyanjar was taken into custody and questioned about Thomas. Hirose testified that Zyanjar did not answer their questions. After the search, Deputy Borland testified that the officers found no evidence that Thomas's home was used as a lab to manufacture methamphetamine.

On January 8, 2004, Hirose asked Deputy Borland to conduct a dog sniff of the money seized from Lakoskey's home. A dog trained to alert in the presence of controlled substances gave a positive alert. However, different samples of currency from the mail parcel had been cross-contaminated prior to the sniff test.

B. *Todd Lakoskey*

The day after the money seizure at Thomas's residence, Hirose sent an email to Postal Inspector Kathryn Nichols, stationed in St. Paul, Minnesota, regarding his

investigation.[1] According to Nichols, the contents of the email provided the basis for the initiation of a "mail watch" on all packages sent to Post Office Box 402 in Biwabik, Minnesota — the post office box of Todd Lakoskey. Nichols discovered that between June 2003 and January 2004, seven Express Mail packages had been delivered to this post office box. The packages were addressed to either Todd Lakoskey or Todd Buchanan, and all seven packages originated in Arizona.

On January 23, 2004, Nichols received a call from the Biwabik Post Office, indicating that a package had arrived for Todd's post office box. The package was addressed to Olga Sampson, and it was sent from a "Buchanan" at a particular return address in Arizona. Nichols told the local postmaster that she was interested in pursuing further investigation of the package and asked if there was an

---

[1]The email message from Hirose to Nichols dated January 8, 2004, states in relevant part:

Kate,

Yesterday I was profiling at the Phoenix AMF and pulled a few good parcels. One was sent from Todd Lakoskey in Biwabik, MN to Tom Lakoskey in Mesa, Arizona. The envelope sent to Tom contained $7,000 in cash. It seems Tom makes Meth at his house (I was shocked!) and mails it to his brother Todd. We didn't actually get a confession from Tom, but his friend . . . Joe (also at the house) said Tom is the leader of this fine enterprise. At any rate we found a couple of express mail boxes at this guy's house and they were all sent recently from Todd.

I really don't think Tom is very bright and it would not surprise me if he decides to send some more home brew to his brother. We did a consent search of the house with detectives from the local sheriff's office and found mostly paraphernalia and a small quantity of Meth. Tom maintained that he was not a dealer and had not used Meth recently . . . Joe said he smoked Meth and MJ the day before . . . .

availabletrained or certified narcotics detecting dog in the area that could sniff the package. While waiting on a narcotics dog to become available, Nichols learned that Olga Sampson was Todd Lakoskey's grandmother. However, she also learned that no one by the name of Buchanan was associated with the sending address. Later that afternoon, an officer with a trained canine unit from a local police department conducted a sniff on the package in Biwabik. The dog did not alert. Despite the negative canine sniff, Nichols testified that she wanted to further detain the package and requested that the local post office send the package to St. Paul. The package was received by Nichols in St. Paul the following day.

Nichols discounted the initial negative sniff and desired to obtain a second dog sniff. She stated that she would have repeated it in any case because she had not been present at the original sniff, and she was acting in accordance with the USPS policy. Following her receipt of the package, she arranged for a second canine sniff. She contacted Detective Mark Meyer of the Minneapolis/St. Paul Airport Police Department. She went to Meyer's home and set up for the sniff in his living room. Meyer arranged the suspect package and various other parcels in the living room. The dog, "Mindy," conducted the sniff but did not alert to the presence of any controlled substance.

Following the second negative dog sniff, Meyer and Nichols placed the suspect package in a compartment in Meyer's television room and closed the door. The compartment contained children's toys, books, and games. After leaving the package in the closed compartment for five to ten minutes, Mindy conducted a third sniff and alerted to the presence of controlled substances in the compartment. Meyer believed the positive sniff resulted because the closed environment concentrated the odor of the narcotics.

As a result of the positive dog sniff, Nichols prepared a search-warrant affidavit and received a search warrant for the package. In the affidavit, Nichols stated that

Inspector Hirose's investigation in Arizona revealed that Thomas had manufactured methamphetamine at his home in Mesa, Arizona, and sent it to Todd in Minnesota. She further set forth the characteristics of the package that made it suspicious, including the handwritten address labels, the use of Express Mail, its origin in a drug source state, the lack of association of the sender's name with the sending address, and Hirose's email indicating possible "drug mailings" to Todd Lakoskey. A search warrant was issued, and the package was opened pursuant to that warrant on January 26, 2004. The package contained a large ceramic Betty Boop doll, with four concealed, separately wrapped plastic bundles of high-purity-level methamphetamine inside.

Nichols learned from the postmaster in Biwabik that Todd had asked about the package multiple times. Nichols then attempted a controlled delivery of the package at the post office. On January 27, 2004, Todd went into the post office, signed for the package, and left. He was arrested in front of the post office carrying the package. Police found the tracking number for the package and $735 in Todd's possession. After his arrest, Nichols obtained a search warrant for Todd's residence. During the search, officers found surveillance cameras and police scanners. Police also found a Western Union receipt reflecting a $900 wire transfer to Thomas Lakoskey in Mesa, Arizona. Inside Todd's house, officers found a digital scale, as well as 14 bundles of $1000. A drug dog alerted to the presence of narcotics on the bundles.

## II. *Procedural Background*

Pre-trial, Thomas filed a motion to suppress evidence seized in Inspector Hirose's searches of the Express Mail package and of his home. Magistrate Judge Raymond Erickson issued a Report and Recommendation ("R&R"), recommending that Thomas's motion be denied. Thomas objected to the R&R, but the district court, nonetheless, adopted the R&R. Similarly, Todd filed a motion to suppress the evidence gained in the search and seizure of the Express Mail package intercepted by Inspector Nichols. The Magistrate Judge issued a R&R, recommending that Todd's

motion also be denied, which the district court adopted. Todd filed a motion to reconsider his suppression motion based on testimony adduced in Thomas's pre-trial hearing. The district court denied that motion as well. During trial, the government introduced evidence pursuant to Federal Rule of Evidence 404(b), detailing previous admissions by the Lakoskeys of drug dealing in northern Minnesota.

Both appellants were convicted after a jury trial on count one, which charged them with conspiracy to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(b)(1)(A), 846. Both appellants were acquitted on counts two and three for possession with intent to distribute 50 grams or more of methamphetamine and attempted possession with intent to distribute 50 grams or more of methamphetamine.

Thomas had a criminal history category of VI and the Pre-Sentence Report ("PSR") calculated his Guidelines offense level at 34, which resulted in a Guidelines range of 262–327 months' imprisonment. However, the district court found it appropriate to sentence him outside of the Guidelines range to 240 months' imprisonment.

Prior to Todd's sentencing hearing, the Government attempted to provide Todd with an opportunity to give a "safety-valve" proffer, but he refused to do so. However, at the beginning of the sentencing hearing, Todd's attorney stated that Todd wanted to make a proffer and asked to continue the sentencing date. The district court concluded that Todd had ample opportunity to give a proffer prior to the sentencing hearing and denied his request for a continuance. The district court found that Todd had a criminal history category of I, and the PSR calculated his offense level at 34, which resulted in a Guidelines range of 151 to 188 months' imprisonment. The district court sentenced Todd to 151 months' imprisonment.

### III. *Discussion*

Appellant Thomas Lakoskey raises two issues on appeal. First, Thomas argues that his Fourth Amendment rights were violated when officers entered his home to search his mail and his home without probable cause. Thomas states that officers forced their way into his home without his consent, a warrant, or exigent circumstances and demanded disclosure of the contents of his mail. Once those contents were disclosed, they were seized without probable cause. Second, Thomas claims that the district court erred in admitting evidence of prior drug distribution by the Lakoskey brothers pursuant to Rule 404(b).

Appellant Todd Lakoskey argues that the district court erred in denying his motion to suppress the primary piece of physical evidence introduced against him at trial—an Express Mail package containing methamphetamine. Todd claims that it was both seized and ultimately searched in violation of the Fourth Amendment, as the postal inspectors detained the package without reasonable suspicion and continued to detain the package after any suspicion was dissipated by two negative dog sniffs. Additionally, Todd asserts that the search warrant obtained to open the Express Mail package was secured with an affidavit containing material omissions and misrepresentations. Next, Todd, like Thomas, argues that the district court erred in introducing evidence of prior distribution of methamphetamine by the Lakoskey brothers pursuant to Fed. R. Evid. 404(b). Lastly, Todd challenges the district court's decision to deny a continuance of the sentencing hearing to allow him to make a safety-valve proffer.

### A. *Motions to Suppress*

"On appeal from denial of motion to suppress, we review the district court's findings of historical fact for clear error, while the district court's determinations of reasonable suspicion and probable cause are reviewed de novo." *United States v. Rodriguez-Lopez*, 444 F.3d 1020, 1022 (8th Cir. 2006).

-9-

1. *Thomas Lakoskey*

Thomas argues that Hirose had no warrant, exigent circumstances, or consent to enter his home after he was repeatedly ordered to leave the property. Thomas urges that all of Hirose's constitutional violations taint any later consent that he may have given and renders it involuntary. Thomas states that the officers required his consent to (1) remain in the curtilage of his home after being ordered to leave; (2) see the contents of his mail; (3) enter his home; and (4) search his home. Thomas asserts that his failure to open the envelope in front of Hirose did not warrant his unauthorized entry into the house. Thomas maintains that Hirose spent nearly ten minutes explaining to him that it was not illegal to send money through the mail, but after "verifying" that the package contained money, Hirose immediately seized the money, left the house, and placed it in a squad car. After Hirose took the money, other officers simply walked into Thomas's home without consent. They immediately walked through his kitchen and into his living room. Thomas was surrounded by police officers, his money was gone, and the officers were asking to search the rest of his home. However, the officers were never given consent to enter his home. Upon review, we hold that the district court erred in denying Thomas Lakoskey's motion to suppress evidence seized in violation of the Fourth Amendment.

First, Thomas argues that he had a reasonable expectation of privacy in his walkway and front door area, and after he asked the officers to leave, they violated his Fourth Amendment rights by remaining. We disagree. "The absence of a closed or blocked gate in this country creates an invitation to the public that a person can lawfully enter along the driveway during daylight hours to contact the occupants for a lawful request and if the request is refused to leave by the same way." *United States v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982). In that case, we held that the driveway is not "protected curtilage." *Id*. "[A] driveway and portion of the yard immediately adjacent to the front door of the residence can hardly be considered out of public view." *Id*. Thus, we will not extend Lakoskey's expectation of privacy to his driveway, walkway or front door area. *Id*. Moreover, under the Fourth Amendment, the question

is not whether the officers were trespassing, but whether Thomas had a reasonable expectation of privacy. *See id*. ("The standard for determining when the search of an area surrounding a residence violates fourth amendment guarantees no longer depends on outmoded property concepts, but whether the defendant has a legitimate expectation of privacy in that area."). Consequently, the officers were lawfully allowed to approach Lakoskey's front door and contact him for investigative purposes.

The tougher question is whether Thomas consented to the entry of his home, the search of the Express Mail package, and the search of his home. "Absent consent or exigent circumstances, a private home may not be entered to conduct a search or effect an arrest without a warrant." *Donovan v. Dewey*, 452 U.S. 594, 598 n.6 (1981). Officers may search an area or an object if they obtain voluntary consent from someone possessing authority over that area or object. *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990). However, "the Fourth Amendment generally prevents the government from compelling a suspect to consent to a search of his home." *Doe v. United States*, 487 U.S. 201, 214 n.13 (1988). The government offered no evidence of exigent circumstances.

In determining whether consent was voluntarily given, we look to the totality of the circumstances. *Chaidez*, 906 F.2d at 380. The government is required to show voluntary consent by a preponderance of the evidence. *Id*. Consent is voluntary "if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied." *Id*. (internal quotations and citation omitted).

Voluntary consent may be express or implied. Here, the district court found that Thomas impliedly consented to Hirose's entry into his home when he stated that he would open the package and then walked out of Hirose's view. The district court relied on *United States v. Wagner*, 884 F.2d 1090 (8th Cir. 1989). However, we find that case distinguishable. In *Wagner* an undercover police officer and a UPS delivery man

made a controlled delivery to the defendant. *Id*. at 1094. "The two men were met in the yard by [the defendant], who agreed to accept the C.O.D. delivery. [The defendant] entered the house to write a check in payment for the delivery, and the two men followed." *Id*. Upon entry, the officer smelled the strong odor of chemicals. *Id*. Thereafter, the officer obtained a search warrant. *Id*. The defendant argued that the officer's entry into his home was an illegal search. *Id*. The court held that the defendant's conduct of *leaving his door open* and allowing the officer and delivery man to follow him into the home implied that he wished the men to follow him inside so he could pay for the package. *Id*. at 1095. Thus, the court found that the defendant, believing that the officer was a delivery person, consented to his entry. *Id*.

In this case, after Thomas accepted the package, he went back inside of his home, closed the security door, and repeatedly asked Hirose and the officers to leave the premises. Despite these requests, Hirose remained in front of Thomas's closed security door for several minutes asking him to open the package. Thomas finally agreed to open the package. However, there is no indication in the record that he invited Hirose's entry, came outside to tell Hirose to follow him, left his door open, or motioned for Hirose to come in, implying that Hirose should follow him. *See United States v. Smith*, 973 F.2d 1374, 1376 (8th Cir. 1992) (implying consent when the defendant's wife stepped aside and motioned for officers to enter); *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) (implying consent when the defendant's wife opened the door and stepped back to let officers enter); *United States v. Curnett*, 123 Fed. Appx. 733, 733 (8th Cir. 2005) (implying consent to enter home when defendant pushed open the screen door for police and asked "What's the matter?"). Moreover, Hirose stated he did not recall asking Thomas if he could enter the house. Therefore, given the facts recited above, the finding of the district court that Thomas's actions constituted implied consent for Hirose to enter his home was clearly erroneous. Hirose's warrantless entry into Thomas's home without consent or the presence of exigent circumstances violated Thomas's Fourth Amendment rights, and the contents of the Express Mail envelope must be suppressed.

After Hirose entered Thomas's home and seized the contents of the Express Mail envelope, he took the money outside and gave it to one of the officers. He then went back into Thomas's home, where he found Thomas speaking with another officer. There is no evidence in the record that Hirose or any of the other officers asked Thomas for permission to enter his home. Further, neither Hirose nor any of the officers remember talking to Thomas about consent to enter the home. Looking at the totality of the circumstances, we cannot say that the government has established by a preponderance of the evidence that Thomas consented to the officers' entry into his home. Therefore, this second warrantless entry into Thomas's home without consent or exigent circumstances violated the Fourth Amendment.

Our finding that the entries into Thomas's home were illegal, however, does not end our analysis. We must also consider whether Thomas's subsequent consent to let the officers search his house dissipated the taint of the initial illegal entry. *See Wong Sun v. United States*, 371 U.S. 471, 486 (1963) (holding that evidence seized after an illegal search must be suppressed unless the government demonstrates that the evidence resulted from "an intervening independent act of free will" sufficient "to purge the primary taint of the unlawful invasion").

"When a consent to search follows an illegal entry . . . the government [must] show more than the voluntariness of the consent; it must also demonstrate that the taint of the initial entry has been dissipated in order to admit evidence seized following the illegal entry." *United States v. Snype*, 441 F.3d 119, 132 (2d Cir. 2006) (internal quotations and citation omitted) (stating that a "majority of our sister circuits"—the Sixth Circuit, Seventh Circuit, Ninth Circuit, and Eleventh Circuit—"require a showing of attenuation as well as voluntariness for a consent following an illegal search or seizure to avoid the consequences of the exclusionary rule"). In determining whether a person's consent purged the taint of the illegal entry, we consider such factors as "(1) the giving of Miranda warnings, (2) the 'temporal proximity' of the illegal entry and the alleged consent, (3) 'the presence of intervening

circumstances,' and (4) 'the purpose and flagrancy of the official misconduct.'" *Id.* (quoting *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)).

Here, the district court found that Thomas's consent after the illegal entry was voluntary. Even if Thomas's consent was voluntary, however, we hold that such consent did not "right the officers' constitutional wrong," because "[Thomas's] acquiescence came immediately on the heels of the illegal entry." *United States v. Duchi*, 906 F.2d 1278, 1285 (8th Cir. 1990). Not only did Thomas's consent to search immediately follow the illegal entry, but no "intervening circumstances" occurred between the illegal entry and the consent.

Therefore, we hold that all fruit of the resulting search must be suppressed. For those reasons, we reverse Thomas Lakoskey's conviction and remand for a new trial.

### 2. *Todd Lakoskey*

First, Todd argues that there was no reasonable, articulable suspicion for the initial detention of his package. Second, Todd submits that even if the initial brief detention of the package was supported by sufficient reasonable suspicion, its continued detention was not. Third, Todd argues that the search warrant ultimately issued for the package was invalid because the supporting affidavit contained material omissions which undermined probable cause. Moreover, in addition to the alleged falsehoods in the affidavit, Todd states that Nichols omitted several critical facts from her affidavit. For those reasons, Todd urges that this court should either reverse the district court's denial of a *Franks*[2] hearing and remand for further fact-finding or find, based on the existing record, that the warrant lacks probable cause and the seized box must be suppressed. Lastly, Todd argues that the *Leon*[3] good faith exception does not save the defective affidavit in support of the search warrant.

---

[2]*Franks v. Delaware*, 438 U.S. 154 (1978).

[3]*United States v. Leon*, 468 U.S. 897 (1984).

-14-

Upon careful consideration, we find that the district court's denial of Todd's motion to suppress was not clearly erroneous. The court must first turn to the question of whether the package was seized. "A law enforcement officer must have reasonable suspicion that a piece of mail, or a package shipped via a commercial carrier, contains contraband to lawfully seize it for investigative purposes." *United States v. Smith*, 383 F.3d 700, 704 (8th Cir. 2004).

> Seizure occurs when a package is removed from its ordinary progress in the mail and is diverted for further investigation. An officer has reasonable suspicion that a package contains contraband if she has a particularized and objective basis that is more than an inchoate and unparticularized suspicion or hunch. The officer must be able to explain the basis of her suspicion. The officer may cite as the basis of her belief, however, facts which, alone and to an untrained eye, appear innocuous, but which, to a trained officer familiar with the methods of drug traffickers, are sufficient to establish reasonable suspicion.

*Id.* (internal citations and quotations omitted). On this record, it is clear that the package was seized when it was pulled from the regular stream of mail and subjected to a dog sniff. *United States v. Logan*, 362 F.3d 530, 533 (8th Cir. 2004) ("[T[his package was seized for Fourth Amendment purposes when Detective Flynn detained it and subjected it to a canine sniff.").

Next, we hold Nichols had reasonable suspicion that the package contained contraband when she seized it, based on the totality of the circumstances. "The determination of whether a government agent's suspicion is constitutionally reasonable is exceedingly fact-specific. We examine the totality of the circumstances arguably supporting a determination of reasonable suspicion, evaluating those circumstances as they would be understood by those versed in the field of law enforcement." *United States v. Morones*, 355 F.3d 1108, 1112 (8th Cir. 2004). Nichols stated the following reasons for detaining the package: (1) the label on the package

-15-

was handwritten, which diminished the likelihood that the package was sent by a business; (2) the package was sent via Express Mail, which is a more expensive method of shipment that would seldom be used for personal correspondence; (3) the package was sent from Arizona, which is a known drug source state; (4) the return address contained a fictitious name for the address listed; and (5) Postal Inspectors in St. Paul, Minnesota, received a tip from Postal Inspectors in Arizona, instructing them to watch for drug shipments to Todd Lakoskey. Although most of these facts taken separately seem innocent, Inspector Nichols explained why each factor gave her a basis for reasonable suspicion that the package contained narcotics. These reasons given by Nichols have been held sufficient. *Id*. (holding that the characteristics of the package, as articulated and explained by the officer, considered in light of the officer's experience in drug interdiction, amount to the reasonable suspicion necessary to constitutionally seize the package).

Whether the two negative dog sniffs dispelled that reasonable suspicion, making any continued detention of the package in violation of the Fourth Amendment, is the closer question. The Tenth Circuit has held a dog's failure to alert on a package removed from the mail stream does not require an investigator to return the package to the mail stream immediately. *United States v. Ramirez*, 342 F.3d 1210, 1212–13 (10th Cir. 2003). Similarly, the district court stated that

> while a positive alert to a package, by a police canine, may alone be sufficient to establish probable cause to search the package, see, United States v. Sun[d]by, 186 F.3d 873, 876 (8th Cir. 1999), the Defendant cites to no authority, nor did our independent inquiry reveal any, for the opposite proposition—namely, that a negative alert dissipates any reasonable suspicion where, as here, several articulable factors supported Nichols['s] assessment that a reasonable suspicion existed to subject the package to a dog sniff in her presence.

We agree.

-16-

"The factors giving rise to reasonable suspicion in the first place remained unchanged by the positive or negative results of the first sniff test." *Ramirez*, 342 F.3d at 1212. Here, Nichols called the Biwabik Police Department to find out if they could perform a dog sniff. They told her no but stated that they knew of another police department that could. However, the Biwabik Police Department never followed up. Thereafter, Nichols spoke with the Biwabik postmaster, who told her that a local canine unit came to the post office to perform a dog sniff, and the dog failed to alert to the package. Because Nichols was not present for the dog sniff and did not speak to the officer who conducted the dog sniff, it was not unreasonable for Nichols to have the package sent to her in St. Paul to conduct another dog sniff in her presence.

Authorities may detain a package for investigation for a reasonable length of time. *Id*. ("Where investigators have acted with reasonable diligence, courts have found acceptable the detention of mail for anywhere from twenty-nine hours to five days."). "[N]o court has set a limit on the amount of time that a package deposited into the USPS Express Mail system may be held where reasonable suspicion that is less than probable cause has been established." *United States v. Gomez*, 312 F.3d 920, 925 (8th Cir. 2002). In this case, only one day elapsed between the initial removal of the package from the mail stream and when Nichols had the facts necessary to support a probable cause determination. That length of time, on its face, considering that Nichols acted with reasonable diligence, is not unreasonable. *See id*. ("The record demonstrates that [Nichols] acted as expeditiously as the circumstances would allow to establish and document the facts necessary to support a lawful search and to apply for a warrant.").

Moreover, we do not find that the second negative dog sniff dissipated Nichols's reasonable suspicion. Officer Meyer explained why Mindy may have failed to alert on the package the first time. Meyer stated that his home had vaulted ceilings, and the package was placed in a very large area, thus making it "difficult for the dog to be able to pick up odors that may be coming off the package . . . ." (Tr. 85). Therefore, Meyer

put the package in a contained area "to take what little odor is coming off the package and restricting it down to a small area." (Tr. 86). After this was done, Mindy alerted on the package for the presence of a controlled substance. We find no error in the district court's determination that this positive dog sniff was enough to establish probable cause for a search warrant.

Finally, Todd Lakoskey challenges Nichols's affidavit submitted to the magistrate in order to obtain a search warrant to open the Express Mail package. Todd claims that it contained falsehoods and material omissions. Todd thus urges that we should either reverse the district court's denial of a *Franks* hearing and remand for further fact-finding, or find based on the existing record that the warrant lacks probable cause and the seized box must be suppressed.

We hold that the search-warrant affidavit established probable cause to open the Express Mail package. "Probable cause to issue a search-warrant exists when the supporting affidavit sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Sundby*, 186 F.3d 873, 875 (8th Cir. 1999) (internal quotations omitted). Here, Inspector Nichols stated in her affidavit (1) why she began a "mail watch" on Todd Lakoskey's post office box; (2) what characteristics of the seized package made her suspicious that it contained controlled substances; and (3) the results of two dog sniffs conducted in her presence by a trained narcotics detection dog. This is enough to establish probable cause. We have held:

> A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable. To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs. An affidavit need not give a detailed account of the dog's track record or education.

*Sundby*, 186 F.3d at 876 (internal citations omitted).

-18-

Although we find that the search-warrant affidavit is facially sufficient, "a court may look behind a search warrant when the affiant intentionally or recklessly misleads the magistrate judge by making an affirmatively false statement or by omitting material information that would alter the magistrate judge's probable cause determination." *Id.* (internal quotations and brackets omitted).

> Under *Franks v. Delaware*, if a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request . . . [Therefore, Lakoskey must] show (1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading, . . . and (2) that the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause.

*United States v. Jacobs*, 986 F.2d 1231, 1233–34 (8th Cir. 1993) (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)) (internal citations and quotations omitted). Todd is unable to show that if the search-warrant affidavit contained the allegedly omitted information, it would not have been sufficient to support a finding of probable cause. As such, we find that the district court did not err in denying his motion for a *Franks* hearing or in denying his motion to suppress the contents of the Express Mail package. First, because we have held that the first negative dog sniff by the canine in Biwabik was not material to this investigation, its inclusion in the search-warrant affidavit would not affect the court's determination of probable cause. Second, because an affidavit need not give a detailed account of the dog's track record, Todd's arguments that Nichols omitted false positives by Mindy is unavailing, as Nichols did state that Mindy was a certified narcotics detection dog.

Lastly, Lakoskey argues that the affidavit falsely stated that Arizona law enforcement officials had information that Thomas Lakoskey manufactured

methamphetamine in Arizona and shipped it to Todd Lakoskey in Minnesota. Although Nichols was unaware that the original email she received from Inspector Hirose contained any incorrect or misrepresented information, courts have imputed such knowledge to affiants where the information is received from another government official. *See United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (holding "the government accountable for statements made not only by the affiant but also for statements made by other government employees which were deliberately or recklessly false or misleading insofar as such statements were relied upon by the affiant in making the affidavit"), *cert. denied*, 525 U.S. 863 (1998); *see also Franks*, 438 U.S. at 164 n.6 (noting that "police could not insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity"). Even if we excluded the information contained in the email from the affidavit, the affidavit still contained sufficient information to support a finding of probable cause based on the positive dog alert. *See Sundby*, 186 F.3d at 876; *Kennedy*, 131 F.3d at 1376–77. For these reasons, we affirm the district court's denial of Todd's motion to suppress.

## B. *Rule 404(b) Evidence*

Both appellants argue that the district court erred by allowing the jury to consider prior acts evidence pursuant to Fed. R. Evid. 404(b). The district court allowed the government to introduce evidence of the Lakoskeys' prior methamphetamine activities in northern Minnesota. The government argued that it was relevant to prove knowledge and intent. The appellants state that although the prior act evidence dealt with conduct arguably similar to the charged conduct, it was not directly relevant to a material issue in dispute in this case. Todd Lakoskey states that he never claimed that he had no knowledge of methamphetamine, that he would never engage in drug dealing, or that he was merely present at the scene of a drug deal. Todd's defense was that he was unaware that the particular box he picked up from the post office contained drugs. Thus, Todd claims that the evidence was offered for an improper purpose, namely, to show propensity. Moreover, Todd argues that the

evidence was more prejudicial than probative. Todd states that the evidence of the 2001 drug dealing was the most damaging evidence offered by the government. The trial lacked any direct evidence. Instead, the government proved a pattern of Express Mail activity between Arizona and Minnesota, the presence of cash in a package to Arizona, and the presence of methamphetamine in a package in Minnesota. The jury acquitted the brothers on the substantive possession counts related to the box containing methamphetamine, demonstrating the closeness of the case. Todd submits that without the Rule 404(b) evidence, the government's case would have been markedly weaker. For these reasons, Todd urges that the Rule 404(b) evidence should have been excluded, and the district court abused its discretion in allowing it.

In Thomas's case, the government claimed that the Rule 404(b) evidence was introduced to show that he had knowledge of the drugs inside of the Betty Boop doll. However, Thomas states that this was an inappropriate basis for allowing Rule 404(b) evidence because the government's only evidence linking him to the box containing the drugs was a fingerprint. Thomas defended the charges against him by claiming that no crime occurred when he touched the box because the drugs were not inside of the box at that time. Thomas asserts that other than the doll, the prior acts evidence was the primary element tying him to this drug conspiracy. Therefore, Thomas urges that the district court abused its discretion by admitting this evidence against him.

We review a district court's decision to admit evidence of a defendant's prior bad acts pursuant to Rule 404(b) for abuse of discretion. *United States v. Tomberlin*, 130 F.3d 1318, 1320 (8th Cir. 1997). "[T]his court 'will reverse only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" *United States v. Foster*, 344 F.3d 799, 800 (8th Cir. 2003) (quoting *United States v. Ruiz-Estrada*, 312 F.3d 398, 403 (8th Cir. 2002)).

-21-

"Rule 404(b) is a rule of inclusion rather than exclusion, allowing the admission of other crimes evidence relevant to any issue in the trial other than any criminal disposition of the accused." *United States v. Koski*, 424 F.3d 812, 817 (8th Cir. 2005) (internal quotations omitted). "Under Rule 404(b), evidence of other crimes is [] admissible as 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .'" *United States v. Forcelle*, 86 F.3d 838, 841 (8th Cir. 1996). "We have adopted a four-part test to determine whether other bad acts evidence is admissible under Rule 404(b). To be admissible, the evidence must be (1) relevant to the material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged." *United States v. Warfield*, 97 F.3d 1014, 1026 (8th Cir. 1996) (internal quotations omitted).

In this case, the district court did not abuse its discretion in admitting evidence of the appellants' former activities involving the possession and distribution of methamphetamine in Minnesota. First, the evidence was relevant to the material issues of knowledge, intent and absence of mistake. Both appellants denied any involvement with the package of methamphetamine sent from Arizona to Minnesota, thus, placing the elements of knowledge and intent at issue. Second, the prior acts were proven by a preponderance of the evidence. In fact, the evidence presented consisted of audio tapes made by the appellants during tape-recorded interviews with authorities. Third, the evidence's probative value exceeded its prejudicial effect by showing that the appellants were familiar with the trafficking of methamphetamine in northern Minnesota. Lastly, the evidence is similar in kind and close in time to the crime charged. As stated by the government, the Rule 404(b) evidence concerned events occurring in 2001. The charged conspiracy in this case occurred from 2003–2004. In addition, the 404(b) evidence concerned the possession and distribution of methamphetamine in northern Minnesota, as did the charged conduct. In short, both offenses involved the same two coconspirators, the same drug, and the same ultimate area of distribution. For all of these reasons, the district court did not abuse its

discretion in admitting the evidence pursuant to Rule 404(b) to show the appellants' knowledge, intent, and absence of mistake.

## C. *Todd Lakoskey's Sentencing Challenge*

Todd argues that the district court improperly denied him an opportunity to seek safety-valve relief pursuant to § 5C1.2 of the United States Sentencing Guidelines and 18 U.S.C. § 3553(f). Under the fifth statutory requirement to qualify for safety-valve relief, the defendant must provide the government with a truthful account of all information and evidence he has concerning the offenses of conviction and relevant conduct. 18 U.S.C. § 3553(f)(5). This proffer of information must occur "not later than the time of the sentencing hearing." *Id.* Todd asserts that "time" in this context carries a different meaning than the "commencement" of the sentencing hearing. Thus, according to Todd, it is appropriate for the district court to allow a continuance when a defendant requests at his sentencing hearing the opportunity to make the safety-valve disclosure.

"District courts are afforded broad discretion when ruling on requests for continuances. Continuances generally are not favored and should be granted only when the party requesting one has shown a compelling reason. We will reverse a district court's decision to deny a motion for a continuance only if the court abused its discretion and the moving party was prejudiced by the denial." *United States v. Cotroneo*, 89 F.3d 510, 514 (8th Cir. 1996) (internal citations omitted). We have held that "in the most typical cases the qualification for the safety valve should come before the commencement of the sentencing hearing in order to prevent the defendant from misleading the government or manipulating the sentence." *United States v. Madrigal*, 327 F.3d 738, 745 (8th Cir. 2003).

Here, we find no abuse of discretion in the district court's refusal to continue Todd's sentencing hearing. Todd requested a continuance at the beginning of his scheduled sentencing hearing. The district court responded that if Todd had a good

reason for not making the safety-valve proffer before sentencing, he would consider granting a continuance. However, the district court stated, "I just don't think that there is any—has been any showing other than either an attempt to delay or just a desire to avoid the inevitable." The appellant had at least five months to give the government a safety-valve proffer. In fact, he expressly rejected an invitation by the government to do so. The district court thus disbelieved Todd's explanation for the delay. Certainly, the district court could have permitted Todd to make a safety-valve proffer at the beginning of the sentencing hearing, but on this record, we cannot say the court was required to permit him to do so. Therefore, the district court did not abuse its discretion in denying Todd's motion for a continuance of his sentencing hearing.

## IV. *Conclusion*

For the reasons stated above, we reverse the district court's ruling on Thomas Lakoskey's motion to suppress and remand for a new trial; we affirm the district court's admission of evidence pursuant to Rule 404(b); and we affirm Todd Lakoskey's conviction and sentence in its entirety.

_____