■ In the Matter of LEROY M., a Person Alleged to be a Juvenile Delinquent, Appellant. [884 NYS2d 231]—

Order of disposition, Family Court, Bronx County (Sidney Gribetz, J.), entered on or about July 7, 2008, which adjudicated appellant a juvenile delinquent, upon a fact-finding determination that appellant had committed an act which, if committed by an adult, would constitute the crime of criminal possession of stolen property in the fifth degree, and placed him with the Office of Children and Family Services for a period of 12 months, reversed, on the law and the facts, without costs, the motion to suppress granted, and the petition dismissed.

Appellant was charged with criminal possession of a laptop computer that had been stolen from a school. At the suppression hearing, the police officers testified that as a result of tracking software loaded on the laptop, they learned information suggesting that appellant possessed the computer. On January 30, 2008, in the middle of the afternoon, they went to appellant's home, purportedly to investigate. The officers had neither a search warrant for the residence nor a warrant for appellant's arrest.

A total of five officers, some in uniform, approached the one-family dwelling, went up the front steps and entered the front door, which led to an inside foyer of the home. Prior to their entry into the residence, they did not ring the doorbell, knock or otherwise announce their presence, nor did anyone let them into the home. Once inside the dwelling, the officer leading the team observed a second door ajar which led into the living room. He knocked on that door and said "Police." A woman, later identified as appellant's sister, came down a staircase from the second floor and said, in substance, that she was glad they were there and to get "him" out of there. The officer asked "Where

is he?" and the sister answered "up the stairs." The police went up to a second floor bedroom and observed a young man with a laptop matching the description of the missing computer. Appellant entered the room and stated, in substance, "That's mine, but a kid gave it to me." He was subsequently placed under arrest.

There is no dispute that prior to going through the front door of the residence, the police did not have anyone's consent or a search or arrest warrant. Furthermore, the presentment agency does not claim there were exigent circumstances. Moreover, the hearing evidence, including the police testimony and the photographs of the house, clearly established that the team of officers went through the front door of what was obviously a private house and into the foyer of the residence. The photographs show the outside of the home, including the steps leading up to an opaque front door. That door has a single mail slot, a peephole, a deadbolt lock above the doorknob, and a single doorbell next to the door. The photographs also depict the area inside the front door, an enclosed foyer with a second door leading into the living room. In the absence of a warrant, exigent circumstances, or consent prior to the entry, the officers' intrusion over the threshold of the home was unlawful (*see Payton v New York*, 445 US 573, 590 [1980] ["the Fourth Amendment has drawn a firm line at the entrance to the house"]) and any evidence obtained as a result must be suppressed (*see People v Levan*, 62 NY2d 139 [1984]).

The fact that appellant's sister subsequently consented to the officers' presence is of no consequence. Where, as here, the consent to search follows an illegal entry, the presentment agency has the burden of showing both that the consent was voluntary and that it was acquired by means sufficiently distinguishable from the entry to be purged of the illegality (*see People v Borges*, 69 NY2d 1031 [1987]; *People v Packer*, 49 AD3d 184 [2008], *affd* 10 NY3d 915 [2008]; *United States v Snype*, 441 F3d 119 [2d Cir 2006]). In determining whether there is sufficient attenuation, a court must consider the temporal proximity between the unlawful entry and the consent, the presence of any intervening circumstances and the purpose and flagrancy of the official misconduct (*see People v Conyers*, 68 NY2d 982, 983 [1986]; *Borges* at 1033; *Snype* at 132).

Here, regardless of the voluntariness of the sister's consent, we find that the taint of the illegal entry was not dissipated at the time the consent was given. With regard to the factor of temporal proximity, the sister's consent occurred virtually contemporaneously with the officers' unlawful entry into the

home. In *Packer*, we noted that "this State's courts have categorically rejected prosecutorial reliance on consent to validate otherwise impermissible searches when consent was given in consequence of improperly initiated police inquiry or intrusion" (49 AD3d at 187). Here, the sister's consent occurred only moments after the officers' unlawful entry into the residence and thus stands in stark contrast to those cases where the passage of time led to a finding of attenuation (*see e.g. People v Santos*, 3 AD3d 317 [2004], *lv denied* 2 NY3d 746 [2004]; *People v Moore*, 269 AD2d 409 [2000], *lv denied* 94 NY2d 951 [2000]), or those where the attenuated act occurred outside the residence (*see e.g. People v Padilla*, 28 AD3d 236 [2006], *lv denied* 7 NY3d 760 [2006]). And, because the entry and the consent here occurred almost instantaneously, there were no intervening events that could serve to purge the taint of the illegality.

Finally, the flagrancy of the police misconduct here must be considered. In response to a simple allegation that a school-aged child possessed a stolen laptop, five police officers, lacking any warrant or exigency, entered a private home without knocking, ringing a bell or otherwise announcing themselves. Although one of the officers gave sparse testimony suggesting that he believed it was difficult to determine if appellant's house was a one or three family home, none of the officers testified that they took any steps to determine the true nature of the dwelling before they entered. And, as noted earlier, the photographs undeniably show a private one-family house. Of greater significance, neither of the two officers who testified at the hearing could explain exactly how they got from the bottom of the steps outside the residence and into the foyer of the home. One merely stated that after arriving at the residence, he "found" himself inside. The other claimed not to know precisely how he got in because another officer was in front of him. Their lack of recollection on this issue raises further questions about the flagrancy of their conduct.

Under these specific circumstances, we conclude that the consent given by the sister was not acquired by means sufficiently distinguishable from the unlawful entry to be purged of the illegality (*see Borges*, 69 NY2d 1031 [1987]; *Conyers*, 68 NY2d 982 [1986]), and appellant was entitled to suppression of the laptop and the statement (*see United States v Lakoskey*, 462 F3d 965, 975 [8th Cir 2006], *cert denied* 549 US 1259 [2007]; *United States v Heath*, 259 F3d 522, 534 [6th Cir 2001]). Concur—Tom, J.P., Catterson, Renwick and Richter, JJ.

Nardelli, J., dissents in a memorandum as follows: Regardless

of whether the initial police entry into the dwelling was illegal, the ultimate determination of this appeal turns solely on whether the actions of the police in going up the stairs to appellant's room were attenuated by virtue of the unequivocally voluntary invitation by appellant's sister welcoming the police presence. Since I believe that the record fully supports a finding that these subsequent police actions were justified, I would affirm the order of disposition.

Appellant's sister, who was 23 years old, had every right to expect privacy in the house in which she lived, and certainly had the right to assert her expectations of privacy to an uninvited individual such as a uniformed police officer, who was the first person that she saw entering the living room as she came down the stairs.

Instead of saying "Stay out," or "What are you doing here?" she said, without hesitation, "Thank God you're all here." Equally revealing, she further testified: "Me and [the officer] started talking . . . And then he was, like . . . all right what's the matter, why did I say thank God that they're here. I was like me and my brother was arguing, he was disrespecting my mother and like eventually *I was going to call them anyway, if he kept it up so I was like thank God you're all here.*" (Emphasis supplied.)

This testimony came in a courtroom, two months after the incident, at a time when her brother was facing delinquency charges. Notwithstanding the serious consequences for her brother, she did not attempt to dilute the circumstances surrounding her initial encounter with the police, by, for instance, intimating that she was intimidated by the police presence into inviting them upstairs. Indeed, even on cross examination, she acknowledged that she had been happy the police "were there."

There is no doubt that when law enforcement officials seek to justify a warrantless search, they are "not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over . . . the premises or effects sought to be inspected" (*United States v Matlock*, 415 US 164, 171 [1974]). Since the police were invited into the house by one of its occupants, a person who had reached the age of majority, the ensuing search was proper.

The majority concludes that the search was not attenuated by the sister's consent. The two cases it cites where the court found that attenuation did not exist, however, involved circumstances where the defendant himself gave the consent to police intrusion after initial illegal police conduct. For instance, in *People v*

*Borges* (69 NY2d 1031 [1987]), the defendant was concededly arrested illegally, and the court directed a suppression hearing to ascertain whether the consent he gave to a subsequent search of his apartment "was sufficiently an act of free will to purge the primary taint of the illegal arrest" (*id.* at 1033). Likewise, in *People v Packer* (49 AD3d 184 [2008], *affd* 10 NY3d 915 [2008]), the court granted suppression of a knife after a defendant had given consent to a search of his bag, after he himself had been the subject of an initial illegal frisk. In this case the consent was given not by the subject of the police action, but by a party who clearly acted voluntarily and without intimidation. It is evident that there was no "official coercion, actual or implicit, overt or subtle" (*see People v Gonzalez*, 39 NY2d 122, 128 [1976]). Indeed, in this case, appellant's sister freely welcomed the police presence, and stated in her testimony that she was going to call the police anyway. I see no reason not to take her at her word, at least for purposes of ascertaining whether attenuation has been established.