UNITED STATES of America,
Plaintiff,

v.

Ricardo Varela CASTRO, Defendant.

Case No. 12–00334–01–CR–W–HFS.

United States District Court,
W.D. Missouri,
Western Division.

July 18, 2013.

Sydney N. Sanders, United States Attorney's Office–KCMO, Kansas City, MO, for Plaintiff.

## ORDER

HOWARD F. SACHS, District Judge.

After review of the record, and noting that there were no objections filed, the report and recommendation (Doc. 59) is hereby adopted, and the motion to suppress (Doc. 28) is hereby GRANTED.

## *REPORT AND RECOMMENDATION*

JOHN T. MAUGHMER, United States Magistrate Judge.

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE (Doc. # 28) filed on February 8, 2013, by defendant Ricardo Varela Castro ("Castro"). On April 10, 2013 and on April 16, 2013, the undersigned held a two-day evidentiary hearing on Castro's motion. Castro was present and represented by his counsel, William A. Seiden and Sean Santoro. The government was represented by Special Assistant United States Attorney Sydney N. Sanders. At the evidentiary hearing, testimony was given by five witnesses: Officer Sargis Zadoyan with the Kansas City Missouri International Airport Police Department, Detective James Morgan with the Kansas City Missouri Police Department, Sergeant Christopher Scott with the Missouri State Highway Patrol, Detective Antonio Garcia with the Kansas City Missouri Police Department, and Special Agent David Larson with the Drug Enforcement Ad-

ministration. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
| --- | --- |
| Gov't. | 1–30 Photographs |
| Gov't. | 31–32 Consents to search |
| Def't. # 2 | Consent to search |
| Def't. # 3 | Warrant form |
| Def't # 4 | Google translate page |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

## PROPOSED FINDINGS OF FACT

1. In October of 2012, Sargis Zadoyan was employed as an officer by the Kansas City Missouri International Airport Police Department and, additionally, was assigned to the Drug Enforcement Administration ("DEA") as a Task Force Officer on the DEA interdiction team. Tr. at 8.

2. On October 31, 2012, Officer Zadoyan was put in contact with a DEA agent out of the State of Utah and informed that a vehicle stop in that state had yielded the seizure of a quantity of liquid methamphetamine. Tr. at 9, 28–29.

3. Officer Zadoyan was also told that the driver and passenger—Maribel Delacruz ("Delacruz") and Ernesto Urbina ("Urbina")—of the stopped vehicle were destined for Kansas City and were interested in cooperating with the DEA in conducting a controlled delivery of the liquid methamphetamine to Kansas City. Tr. at 9–10, 30.

4. The purpose of a controlled delivery is to enable law enforcement officers to identify recipient parties and, in the process, dismantle drug trafficking organizations. Tr. at 21.

5. After learning that Delacruz and Urbina were coming to Kansas City to participate in a controlled delivery, Officer Zadoyan assembled an initial team of six or seven law enforcement officers to work on the controlled delivery. Tr. at 33.

6. The next day, November 1, 2012, Delacruz and Urbina arrived in Kansas City accompanied by Utah DEA agents. Tr. at 10–11.

7. Shortly after arriving in Kansas City, Urbina received a telephone call on his cell phone from a party in California who gave Urbina instructions that he would be receiving a call from someone in Kansas City to arrange for the delivery of the liquid methamphetamine. Tr. at 11, 36, 67.

8. Prior to Urbina receiving this call from someone in Kansas City, he was interviewed by Officer Zadoyan and Urbina and informed Officer Zadoyan that he had made previous deliveries of liquid methamphetamine to Midwestern cities (e.g., Des Moines) on behalf of the California party, but this was his first trip to Kansas City. Tr. at 12–13.

9. Urbina told Officer Zadoyan that the liquid methamphetamine was placed in the vehicle's windshield washer fluid container and then, upon arrival in the destination city, the container would be unloaded by individuals Urbina would meet in the destination city. Tr. at 13–14.

10. Urbina told Officer Zadoyan that after he would meet with the designated individual in the destination city, the container with the liquid methamphetamine would be removed from the vehicle and that this occurred in different locations "such as parking lots, in front of McDonald's, and sometimes in a house." Tr. at 13, 155–56, 158, 160–61.

11. During the interview with Officer Zadoyan and other law enforcement officers, Urbina received three local calls on his cell phone, but the officers would not permit him to answer since the interview was ongoing. Tr. at 14.

12. Urbina then received another call from the California party which the officers allowed him to answer. Tr. at 14–15.

13. Urbina was told by the California party that the Kansas City contact was trying to reach him and Urbina was given a local number to call. Tr. at 15.

14. When Urbina called the local number, he was told to drive his vehicle (containing the liquid methamphetamine in the vehicle's windshield washer fluid container) to a particular Denny's restaurant in Kansas City and to wait in the Denny's parking lot for further contact. Tr. at 16, 42–43.

15. Prior to Urbina leaving the DEA office, a tracking device was placed in Urbina's vehicle with Urbina's consent. Tr. at 16–17.

16. While installing the tracking device, Urbina's vehicle was also inspected by Detective James Morgan with the Kansas City Missouri Police Department. Tr. at 71, 73, 116.

17. Detective Morgan determined that the easiest way to access and remove the vehicle's windshield washer fluid container was through the wheel well requiring some disassembly of the vehicle. Tr. at 73–74.

18. Detective Morgan estimated that removing the vehicle's windshield washer fluid container would take 20 to 45 minutes. Tr. at 74, 116.

19. Several law enforcement agents then went ahead of Urbina and established surveillance at the Denny's. Tr. at 17, 75, 174–75.

20. On his way to the Denny's, Urbina received a telephone call from the Kansas City contact changing the location for the meet to a different Denny's. Tr. at 18, 44.

21. Urbina told Officer Zadoyan about the new location for the meet and, despite the last minute change, law enforcement officers were still able to establish surveillance at the second Denny's prior to Urbina's arrival. Tr. at 18, 75–76, 176–77.

22. When Urbina arrived at the Denny's parking lot at approximately 6:54 p.m., he began a conversation with two occupants of a white Jeep Grand Cherokee with Missouri license plates that was also parked in the lot. Tr. at 18–19, 43–44, 177.

23. Following the conversation, Urbina went inside the restaurant while the passenger in the Grand Cherokee got into Urbina's vehicle and drove off with the Grand Cherokee following. Tr. at 18–19, 179.

24. An agent then interviewed Urbina in the Denny's and Urbina told him that he was told to leave the keys inside his vehicle and go inside the Denny's and the car would be returned in approximately 40 minutes. Tr. at 19, 44.

25. Other law enforcement officers (including Officer Zadoyan and Detective Morgan) followed the two vehicles and eventually observed the vehicles going into a driveway at a residence located at 3508 Phelps Avenue in Independence, Missouri, at approximately 7:00 p.m. Tr. at 19–20, 45, 78, 181.

26. The Grand Cherokee was parked in plain view in the driveway but Urbina's vehicle had been pulled into a garage and the garage door had been shut. Tr. at 20.

27. Various law enforcement officers took about 10 minutes to set up surveillance around the Phelps Avenue residence including being stationed at the various entries and exits to the house (including the attached garage) in case anyone tried to escape from the premises. Tr. at 24, 45, 51, 79–80, 82, 155, 184.

28. The law enforcement officers nearest the garage (including Detective

Morgan) noted that there were lights on in the garage, they could hear at least two people talking inside the garage in Spanish (but could not understand what was being said), and they could hear tool noises from the garage. Tr. at 20–22, 48, 81, 82–83, 119, 151.

29. Law enforcement officers were attempting to be quiet so as to not tip off anyone in the Phelps Avenue residence as to their presence. Tr. at 49, 61.

30. Originally, Officer Zadoyan was going to knock on the front door and try to make contact with the residents and make an entrance through the front door. Tr. at 24, 82.

31. Officer Zadoyan knocked on the front door, but no one answered. Tr. at 46.

32. After approximately five minutes of surveillance at the garage, Detective Morgan heard the sound of a car engine being started and running for 20–30 seconds before the engine was shut off again. Tr. at 84, 120, 154.

33. Detective Morgan believed that the vehicle in the garage was started to enable the wheels to be turned to enable easier access to the vehicle's windshield washer fluid container. Tr. at 84, 154.

34. At that point, Detective Morgan decided to make an entry into the garage because he believed the people in the garage were attempting "to gain access to the liquid methamphetamine." Tr. at 85.

35. Detective Morgan's purpose was "to primarily secure the methamphetamine and arrest the individuals involved." Tr. at 85.

36. Entry was made by Detective Morgan lifting the garage door while announcing himself as "police." Tr. at 55, 86, 118.

37. When Detective Morgan entered the garage he saw Urbina's vehicle with the hood up, the front bumper pulled away from the vehicle, and a man on the garage floor (subsequently identified as Castro) next to the vehicle. Tr. at 87–89.

38. Detective Morgan also heard footsteps going up some stairs from the garage into the house. Tr. at 87, 153.

39. Castro was handcuffed and placed under arrest. Tr. at 88, 96, 236.

40. Law enforcement then did a sweep through the house, detaining two additional individuals. Tr. at 89–91.

41. After the house had been swept, Detective Morgan approached Castro and determined that Castro did not speak English. Tr. at 92.

42. Thereafter, Detective Morgan arranged for Detective Antonio Garcia with the Kansas City Missouri Police Department (who is fluent in Spanish) to come to the scene to converse with Castro. Tr. at 92, 206–07, 209.

43. Detective Garcia had been one of the officers at the Denny's with Urbina. Tr. at 125, 212–14, 228.

44. When Detective Garcia arrived after 10–20 minutes, Detective Morgan asked him to speak with Castro (who was still handcuffed) and ascertain who actually lived in the residence and seek to gain consent to search the residence. Tr. at 92, 125, 203, 215–16.

45. Castro's handcuffs were then removed. Tr. at 96, 221.

46. Castro told Detective Garcia that he lived at the residence as a renter. Tr. at 217.

47. After speaking in Spanish with Castro, Detective Garcia told Detective Morgan that Castro was the legal resident of the house. Tr. at 94.

48. Detective Morgan then filled out a written consent to search form and

gave it Detective Garcia to obtain Castro's consent and signature. Tr. at 94.

49. Detective Garcia told Castro that the officers wanted permission to search the entire residence. Tr. at 218, 232–33.

50. Detective Garcia showed Castro a written consent to search form (written in Spanish) and had Castro read the form out loud. Tr. at 218.

51. After reading the form, Castro informed Detective Garcia that he would give his consent to search and signed the consent form. Tr. at 218–20; Gov't # 31.

52. Law enforcement officers then searched the residence. Tr. at 95

53. Following the search, Castro was advised of his *Miranda* rights in Spanish by Detective Garcia and Castro requested an attorney. Tr. at 94, 223–24.

54. No effort was made to obtain a search warrant prior to Detective Morgan's initial entry into the garage. Tr. at 50–51, 57–58.

55. Law enforcement officers did not make any plans prior to the controlled delivery for obtaining a search warrant. Tr. at 58, 195.

56. Law enforcement officers were not worried that liquid methamphetamine was being destroyed since the inhabitants of the Phelps Avenue residence did not know that the officers were there. Tr. at 55, 60, 65, 126–127, 132.

## PROPOSED CONCLUSIONS OF LAW

■ In his motion to suppress, Castro challenges the admissibility of any evidence obtained during the search of the residence at 3508 Phelps Avenue on November 1, 2013, as well as the fruits of that search. Without question, individuals possess a privacy interest in their property that is protected by the Fourth Amendment. *See, e.g., United States v. Gwinn,* 191 F.3d 874, 878 (8th Cir.2000). As pro-

tection for the citizen from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a court-sanctioned search warrant based on probable cause before undertaking a search of private property. *See, e.g., Shade v. City of Farmington, Minnesota,* 309 F.3d 1054, 1059 (8th Cir. 2002). Those privacy interests are particularly enhanced when a search of an individual's domicile or residence is at issue. *See, e.g., Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) ("It is axiomatic that the physical entry of the house is the chief evil at which the wording of the Fourth Amendment is directed.").

■ The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, however, the constitution does not forbid all searches and seizures, but only *unreasonable* searches and seizures. *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960). As previously noted, in many search and seizure scenarios—particularly where a person's residence is involved—the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. In this case, law enforcement officers did not have a warrant to enter or search 3508 Phelps Avenue. The Supreme Court has cautioned:

[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.

*Arizona v. Gant,* 556 U.S. 332, 338, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485 (2009)

(*quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). In the present case, the government seeks to justify the entry and search of 3508 Phelps Avenue under three possible exceptions to the warrant requirement: observed commission of a crime, exigent circumstances, and consent. The Court will address each exception in turn.

■ In testimony during the evidentiary hearing, law enforcement officers repeatedly made the point that the entry into Phelps Avenue address was justified because they had probable cause to believe that Castro had committed and was in the process of furthering the commission of a crime. The officers may well be correct and, indeed, it seems likely that Urbina's vehicle could legitimately have been stopped after leaving the Denny's but before reaching the residence. But, even with all of that, the Constitutional rules changed when the vehicle arrived at the residence and was parked in the attached garage. As succinctly noted by the Supreme Court:

We are not dealing with formalities. Because the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion stands at the very core of the Fourth Amendment, our cases have firmly established the basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. Thus, absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to

believe that incriminating evidence will be found within.

*Groh v. Ramirez*, 540 U.S. 551, 558–59, 124 S.Ct. 1284, 1290–91, 157 L.Ed.2d 1068 (2004) (*citations and internal punctuation omitted*). The probable cause possessed by the officers, standing alone, does not justify the entry into Castro's residence.[1]

■ While it is true in most cases that police officers may not enter or search a home without a warrant authorizing them to do so, it is nonetheless settled law, as well as common sense, that emergency circumstances may take precedence over traditional Fourth Amendment concerns and permit law enforcement officers to take actions that might otherwise require a warrant.

Police officers may not enter or search a home without a warrant unless justified by exigent circumstances. The exigent circumstances exception to the warrant requirement is narrowly drawn. The exception justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed.

*United States v. Ball*, 90 F.3d 260, 263 (8th Cir.1996). In assessing the presence of such exigent circumstances, "[t]he question ... is not whether there was actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so." *Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir.1994).

Having carefully considered the testimony of the officers, the Court concludes that exigent circumstances did not exist in this

---

1. There is no apparent dispute that Castro's attached garage is considered part of his residence for purposes of Fourth Amendment protection. *Compare United States v. Oaxaca*, 233 F.3d 1154, 1157 (9th Cir.2000) ("[n]o reason exists to distinguish an attached garage from the rest of the residence for Fourth

Amendment purposes."). Similarly, it is uncontested that Castro—as a renter—has standing to assert Fourth Amendment protection (and, as discussed, *infra*, authority to waive that protection and consent to a search). *See, e.g., United States v. Bradley*, 869 F.2d 417, 419 (8th Cir.1989).

case. The Court understands "exigent" to mean just that—an emergency situation. The testimony of the officers in this case indicates that that this was not an emergency situation, but rather a situation that *might* become an emergency.

The government notes that exigent circumstances existed because the drug involved in this controlled purchase was liquid methamphetamine and, as a result, could be easily destroyed if the suspects became alerted to the law enforcement presence.[2] Such reasoning is at odds with precedent. The recent decision of *United States v. Ramirez*, 676 F.3d 755 (8th Cir. 2012) is instructive.

In *Ramirez*, law enforcement officers traced individuals suspected of smuggling heroin in their shoes to a specific motel room. After the officers obtained a key card for the room from the motel operator, the officers approached the motel room door, swiped the key card, announced "housekeeping," and forced entry into the room. There was no evidence that the suspects knew officers were outside the motel room door. Under these facts, the Eighth Circuit reversed a contrary district court finding and concluded that the entry into the motel room was not justified by exigent circumstances.

The court noted that the officers testified that based on the actions of the suspects (they had repeatedly changed motels), there was a concern that the suspects "were trying to elude officers or were going to destroy evidence and personal items linking them to the case." *Id.* at 760. The Court rejected this rationale.

Exigency, however, does not exist by mere supposition. Stating a belief that these men were about to destroy evidence after safely arriving at the [motel] and checking into their room, seemingly without knowledge that they were being tracked by law enforcement, is quite speculative. And, as noted, [an officer's] subjective belief is not determinative in our analysis. "[Instead, t]his court must look objectively at what a reasonable police officer would believe[,]" given the objective facts at the officer's disposal at the time of entry. *Id.* (*quoting, in part, United States v. Williams*, 521 F.3d 902, 908 (8th Cir. 2008)).

Reviewing the facts of this case, there simply were not sufficient objective facts known to the law enforcement officers at the moment the garage was breached to justify a reasonable belief that evidence was in *imminent* danger of being destroyed. It defies logic to conclude that narcotics traffickers would destroy contraband despite being unaware of the close proximity of law enforcement. To the extent that the government believes that current exigent circumstances jurisprudence is inadequate to address the real world needs of law enforcement officers monitoring controlled deliveries or dealing with liquid forms of controlled substances, such modifications to the general rule must come from a higher court.

 The government's final argument for justifying the search of Castro's residence is his consent. It is established law that an exception to the warrant require-

---

**2.** The testimony of DEA Agent David Larson is representative:

Q: So what was the exigent circumstances you were told about?
A: That the evidence had entered the garage.

Q: Well, I understand that. But what's the exigent circumstances? What does exigency mean to you?
A: That there's a need to get in and secure it, that it could be—it could leave or be destroyed.
Tr. at 265.

ment of the Fourth Amendment is consent to search. *Florida v. Jimeno,* 500 U.S. 248, 250–51, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991). In a typical consent-to-search case, the touchstone in analyzing a motion to suppress is whether the consent was voluntary. Consent is also central to the analysis herein, but with the added dimension that the government is arguing that Castro's consent in this case effectively purges the taint of any unconstitutional entry and arrest prior to the consent.

The argument advanced by the government is not novel. For instance, in *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Supreme Court found that agents had illegally entered and seized the premises of a suspected drug trafficker without a warrant. *Id.* at 802, 104 S.Ct. at 3384. A warrant was later issued some nineteen hours after the illegal seizure of the premises based solely on information known to the agents before the illegal entry. *Id.* at 801–02, 104 S.Ct. at 3383–84. The issue before the Supreme Court was whether the drugs and other evidence not observed during the initial illegal seizure, but first discovered by the police the day after the illegal seizure, under an admittedly valid search warrant, should have been suppressed. *Id.* at 804, 104 S.Ct. at 3385. The Court held that the evidence obtained pursuant to the authorized search was admissible notwithstanding the prior illegal seizure. *Id.* at 813–14, 104 S.Ct. at 3390. The Supreme Court reasoned:

> It is ... beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged. This evidence was discovered the day following the entry, during the search conducted under a valid warrant; it was the product of that search, wholly unrelated to the prior entry. The valid

warrant search was a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the entry. Had police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here.

*Id.* at 814–15, 104 S.Ct. at 3390.

In this case, the government seeks to apply the reasoning of *Segura* to the case of a subsequent consent. Again the concept is not novel. *See, e.g.,* Kimberly J. Winbush, *Effect of Retroactive Consent on Legality of Otherwise Unlawful Search and Seizure,* 76 A.L.R.5th 563 (2000 & 2013 Supp.). In such cases, the Eighth Circuit has adopted an expanded test of voluntariness of consent:

> When a consent to search follows an illegal entry ... the government must show more than the voluntariness of the consent; it must also demonstrate that the taint of the initial entry has been dissipated in order to admit evidence seized following the illegal entry. In determining whether a person's consent purged the taint of the illegal entry, we consider such factors as (1) the giving of *Miranda* warnings, (2) the temporal proximity of the illegal entry and the alleged consent, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct.

*United States v. Lakoskey,* 462 F.3d 965, 975 (8th Cir.2006) (*internal citations and punctuation omitted*). Thus, the Court must first determine whether Caro's consent was voluntary and, if so, next consider whether the circumstances establish that the consent purged the taint of the initial illegal entry.

■ In broad strokes, consent to search is voluntary if it is "the product of an essentially free and unconstrained choice by its maker ... rather than a product of duress or coercion, express or implied." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). To assist a court in making this ultimate determination, numerous factors relating to the person giving the consent and the environment surrounding the consent have been articulated. For instance, with regard to a defendant who consents, courts consider:

(1) the defendant's age;

(2) the defendant's general intelligence and education;

(3) whether the defendant was under the influence of drugs or alcohol;

(4) whether the defendant was informed of his *Miranda* rights prior to consent; and

(5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

*United States v. Alcantar,* 271 F.3d 731, 737 (8th Cir.2001). With regard to the environment surrounding consent, courts will examine whether the person who consented:

(1) was detained and questioned for a long or short time;

(2) was threatened, physically intimidated, or punished by the police;

(3) relied upon promises or misrepresentations made by the police;

(4) was in custody or under arrest when the consent was given;

(5) was in a public or secluded place; or

(6) either objected to the search or stood by silently while the search occurred.

*United States v. Mancias,* 350 F.3d 800, 805 (8th Cir.2003).

In this case, and after making credibility findings of the testimony given at the evidentiary hearing, the Court concludes Castro was an adult of seeming adequate intelligence and education having read the consent to search form out loud and indicating that he understood it. There is no evidence that Castro was under the influence of any drugs or alcohol nor is there any evidence that Castro was threatened, physically intimidated, or punished by any officers. Likewise, there is no indication in the record that officers made any promises or misrepresentations to Castro. Castro had been detained for less than 20 minutes when he was asked to consent. Prior to consenting, Castro had remained in his garage—with the door open—while officers moved throughout the residence and a Spanish speaking officer was summoned to the scene.

On the other hand, Castro was in custody and under arrest when the consent was given and had been handcuffed until just before signing the written consent form. And Castro had not been informed of his *Miranda* rights.

Although the question is close, the Court concludes that Castro did voluntarily consent to the search of his house. Castro conversed in Spanish with Detective Garcia without difficulty, read out loud the terms of the proposed consent-to-search form, verbally agreed to the search thereafter, and signed the form. On the whole, the Court finds that Castro knowingly and intelligently understood what the consent-to-search form meant and signed the form of his own free will.

■ Having (narrowly) concluded that Castro voluntarily consented to a search of his residence, the Court must turn to the factors listed by the Eighth Circuit in *Lakoskey* and determine whether Castro's consent is sufficiently attenuated to purge the taint of the initial illegal entry into

Castro's residence (and his illegal arrest at that time). The *Lakoskey* factors were:

(1) the giving of *Miranda* warnings,

(2) the temporal proximity of the illegal entry and the alleged consent,

(3) the presence of intervening circumstances, and

(4) the purpose and flagrancy of the official misconduct.

Again, as previously noted, although Castro was arrested as soon as officers entered his residence, he was not read his *Miranda* rights until after he consented to a search of his home. Approximately 20 minutes passed between the illegal entry (and arrest) and the time when Castro consented. During that time, Castro was seated in a chair in his garage handcuffed watching law enforcement officers going in and out of his house.

With regard to the "misconduct," the Court does conclude that the initial entry into the house was unconstitutional, but also recognizes the concerns of the officers on the scene that there might not be time to obtain a search warrant. On the other hand, several of the officers knew about the proposed controlled delivery for several hours and knew that there was a reasonable possibility that the vehicle containing the liquid methamphetamine would be taken to a residence. Yet no efforts were made prior to or during the controlled delivery to explore the possibility of obtaining a search warrant. Had the officers entered the residence and told the inhabitants that a search warrant was being obtained and the officers were going to maintain the *status quo* until then (the facts of *Segura*) and then thereafter obtained a valid consent, the Court arguably might be inclined to purge the taint of the initial entry. In this case, however, the officers illegally entered the residence, said nothing about a search warrant, arrested Castro and obtained his consent prior to advising him of his rights—all within a very short period of time and without any other intervening circumstances. Under these facts, the Court cannot purge the taint of the initial illegality. Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **GRANTING** the Motion to Suppress (Doc. # 28) filed February 8, 2013.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

June 20, 2013.

