¶ 44.
DANIEL KELLY, J.
(concurring). I join the court's mandate and the opinion to the extent it discusses Mr. Brar's express consent to the blood test while he was present in the police station. I cannot join any part of the court's discussion of implied consent because it misunderstands how our implied consent law functions, it says "consent" implied by law is something voluntarily given when such a thing is *708 impossible, it introduces a destructive new doctrine that reduces constitutional guarantees to a matter of legislative grace, and it fails to properly distinguish between (a) express consent, (b) consent implied by conduct, and (c) "consent" implied by law. And all of this was entirely gratuitous — as the court's own opinion demonstrates, implied consent need have no part in our resolution of the case. Because this last point describes where the court's opinion should have ended, I will begin there.
I — I
¶ 45. There was no need to march into the minefield of "consent" implied by law.[1] Mr. Brar asked us to review his conviction for two reasons. First, he says he did not give express consent to chemical testing of his blood. And second, he says he only acquiesced to the blood test because Officer Michael Wood said he did not need a warrant to obtain a blood sample. The presenting questions, therefore, called for us to review what Mr. Brar said and — if it amounted to express consent —determine whether his consent was voluntary. State v. Artic, 2010 WI 83, ¶ 30, 327 Wis. 2d 392, 786 N.W.2d 430 ("To determine if the consent exception is satisfied, we review, first, whether consent was given in fact by words, gestures, or conduct; and, second whether the consent given was voluntary.").
¶ 46. We are not considering Mr. Brar's interaction with Officer Wood in the first instance, of course. *709 We are reviewing the circuit court's findings of fact, which we leave undisturbed unless they are clearly erroneous. Phelps v. Physicians Ins. Co. of Wis., Inc., 2009 WI 74, ¶ 34, 319 Wis. 2d 1, 768 N.W.2d 615. According to the circuit court, Officer Wood asked Mr. Brar whether he would submit to an evidentiary chemical test of his blood. The record reflects that Mr. Brar said "of course," and that he didn't want to lose his driving privileges. Our review revealed nothing clearly erroneous about the circuit court's findings, and so we accepted that Mr. Brar expressly consented to a blood test.
f 47. We promptly, and properly, dispatched Mr. Brar's argument that his consent was not voluntary. According to Mr. Brar, when Officer Wood told him he did not need a warrant to conduct the blood test, he made a misrepresentation of law sufficient to negate the voluntariness of his consent. But Officer Wood's statement came after Mr. Brar's consent, which made his statement correct — he didn't need a warrant because Mr. Brar had consented to the search. See Artic, 327 Wis. 2d 392, ¶ 29 (One well-established exception to the warrant requirement is a search conducted pursuant to consent.). Thus, there was no misrepresentation to cast doubt on the voluntariness of Mr. Brar's consent. Mr. Brar did not argue his consent was involuntary for any other reason, so we properly concluded his consent was constitutionally valid.
f 48. That should have been the end of our opinion. Traditionally, when the presenting questions resolve the matter, we declare our treatment of the case complete at that point. See Black v. City of Milwaukee, 2016 WI 47, ¶ 39 n.24, 369 Wis. 2d 272, 882 N.W.2d 333, cert. denied sub nom. Milwaukee Police Ass'n v. City of Milwaukee, 137 S. Ct. 538 (2016) ("We do not *710 address these issues because they are not necessary to resolve this case"); see also State v. Cain, 2012 WI 68, ¶ 37 n.11, 342 Wis. 2d 1, 816 N.W.2d 177 ("[A]n appellate court should decide cases on the narrowest possible grounds." (quoting Md. Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶ 48, 326 Wis. 2d 300, 786 N.W.2d 15)); Hull v. State Farm Mut. Auto. Ins. Co., 222 Wis. 2d 627, 640 n.7, 586 N.W.2d 863 (1998) ("As a general rule, when our resolution of one issue disposes of a case, we will not address additional issues."). Experience has taught us it is usually wise to leave peripheral questions to a future case in which they return as dispositive issues. There are good reasons to honor that experience. The process of reasoning from premises to conclusion imposes a rigorous discipline on our research, deliberation, and analysis that is absent when we opine on matters beyond those necessary to our judgment. The court's opinion validates the wisdom of our tradition.
II
¶ 49. Not only did we boldly march into the "implied consent" minefield, we did it blindfolded. Our implied consent statute, Wis. Stat. § 343.305 (2013-14),[2] is not a model of clarity. That should have driven us to a searching, wide-eyed perusal of the statute's language to help us through this fraught territory. Instead, with the benefit of just three cursory sentences addressing the statute's terms, we announced that it provides a real-life, constitutionally-sufficient, consent to a blood test: "Brar consented under Wisconsin's implied consent law. He availed *711 himself of the roads of Wisconsin, and as a result, he consented through his conduct to a blood draw." Majority op., f 29. That, however, is not what the statute does.
¶ 50. The question the court answered, but did not analyze, is whether "implied consent" actually authorizes a law enforcement officer to obtain a sample of a driver's blood. To discover whether it does, we must consider three of the statute's functional components. The first addresses itself to its eponymous subject— "consent" implied by law (I will call this the "Implied Consent Component"). Wis. Stat. § 343.305(2). The second component governs a law enforcement officer's request for a blood test (the "Test Authorization Component"). Wis. Stat. § 343.305(3)-(4).[3] The third covers the consequences for refusing an officer's request for a test (the "Penalty Component"). Wis. Stat. § 343.305(9)-(10). With but one exception that is not relevant here, there is no operational connection between the Implied Consent Component and the Test Authorization Component.[4]
¶ 51. By its own terms, the Implied Consent Component isolates itself from the authorization the State must obtain to collect a sample of the driver's blood. In relevant part, it says this:
*712 Implied Consent. Any person who . .. drives or operates a motor vehicle upon the public highways of this state ... is deemed to have given consent to one or more tests of his or her breath, blood or urine, for the purpose of determining the presence or quantity in his or her blood or breath, of alcohol. .. when requested to do so by a law enforcement officer under sub. (3) (a) or (am) or when required to do so under sub. (3) (ar) or (b). Any such tests shall be administered upon the request of a law enforcement officer.
Wis. Stat. § 343.305(2) (emphases added). This provision creates the "implied consent," but it simultaneously forecasts its operational independence from the Test Authorization Component: Operating a motor vehicle gives rise to "deemed" consent, but the actual blood test must be requested by the law enforcement officer.[5]
¶ 52. What the Implied Consent Component forecasts, the Test Authorization Component makes explicit — the officer must ask the driver for permission to conduct a blood test: "Upon arrest of a person for [operating while intoxicated] ... a law enforcement officer may request the person to provide one or more samples of his or her breath, blood or urine for the purpose specified under sub. (2)." Wis. Stat. § 343.305(3)(a) (emphasis added). When an officer asks a driver for permission to conduct a test, he must recite a very specific warning. The provision introducing the warning echoes the fact that he is asking permission —not telling: "At the time that a chemical test specimen is requested under sub. (3) (a), (am), or (ar), the law enforcement officer shall read the following to the *713 person from whom the test specimen is requested . . . Wis. Stat. § 343.305(4) (emphases added). The statutorily-mandated warning confirms the officer is asking permission, and the driver may say "no" to the officer's request:
You have either been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or drugs, or both, or you are the operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person, or you are suspected of driving or being on duty time with respect to a commercial motor vehicle after consuming an intoxicating beverage.
This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system. If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended. If you refuse to take any test that this agency requests, your operating privilege will be revoked and you will be subject to other penalties. The test results or the fact that you refused testing can be used against you in court.
If you take all the requested tests, you may choose to take further tests. You may take the alternative test that this law enforcement agency provides free of charge. You also may have a test conducted by a qualified person of your choice at your expense. You, however, will have to make your own arrangements for that test.
If you have a commercial driver license or were operating a commercial motor vehicle, other consequences may result from positive test results or from refusing testing, such as being placed out of service or disqualified.
Wis. Stat. § 343.305(4) (emphases added).
*714 ¶ 53. I'm not going to pretend the meaning of "request" is an open question. We are all fluent English-speakers here, and we know it means what it so obviously does — it is a question, a seeking of an answer. And when the request is for a blood sample, we know the officer is asking permission to take it. I suppose someone might say the statute's repeated admonition that the officer must seek permission to take a sample is a tip of the hat to good manners. I trust the government's agents make every effort to be polite in their interactions with Wisconsin's residents, so this would be a frivolous mandate to write into a statute. Absent any textual hints that the repeated "request" requirement is more about etiquette than a mandate to ask permission, we shouldn't read it that way. See State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 ("[Statutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" (quoting Seider v. O'Connell, 2000 WI 76, ¶ 43, 236 Wis. 2d 211, 612 N.W.2d 659)).
f 54. So what does that mean for "implied consent"? It is axiomatic that if one must ask for something, then one doesn't yet have it. If the statute's "implied consent" really is equal to a driver's voluntarily and freely given consent (as the court claims), then all of this "request" business is so much doubletalk. If the court is right, then there is no need to ask because the law says we may act as though the driver already said "yes." So Wis. Stat. § 343.305(3)(a) would read: "Upon arrest of a person for [operating while intoxicated] ... a law enforcement officer may request tell the person to provide one or more samples of his or her breath, blood or urine for the purpose specified under sub. (2)." And § 343.305(4) would have to read: "At the time that a *715 driver is told to provide a chemical test specimen ⅛ requested under sub. (3) (a), (am), or (ar), the law enforcement officer shall read the following to the person told to provide a from whom-the test specimen is requested . .. The warning required by § 343.305(4) would need to be similarly amended to remove the "request" language, as well as the confirmation that the subject can tell the officer "no." But the officer does have to ask permission, and the driver may indeed refuse his request. And that means "implied consent" and the consent actually necessary to obtain the blood sample are quite obviously not the same thing, and do not serve the same function.
¶ 55. "Implied consent" does, however, have a purpose. And that purpose is to juke the Fourth Amendment. We know that taking a blood sample in the absence of a warrant or exigent circumstances is an unconstitutional search. Birchfield v. North Dakota, 579 U.S. _, 136 S. Ct. 2160, 2173 (2016) ("The Amendment thus prohibits "unreasonable searches," and our cases establish that the taking of a blood sample or the administration of a breath test is a search."). So, contrary to what our opinion says today, the legislature cannot simply authorize police officers to take blood samples without asking permission.[6] *716 Thus, "implied consent" cannot be the same thing as consent given pursuant to a police officer's request. And indeed it is not.
¶ 56. "Implied consent" has an entirely different function. It is part of a mechanism designed to obtain indirectly what it cannot (and does not) create directly —consent to a blood test. The Implied Consent Component works in tandem with the Penalty Component to cajole drivers into giving the real consent required by the Test Authorization Component. The Penalty Component punishes a driver by revoking his operating privileges if he refuses an officer's request for a blood sample. Wis. Stat. § 343.305(9)-(10). But that smacks of punishing someone for the exercise of his constitutional right to be free of unreasonable searches, upon which we generally frown. Harman v. Forssenius, 380 U.S. 528, 540 (1965) ("It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution.").
¶ 57. It is this consideration that, finally, explains why the Implied Consent Component exists and where it slips into place. The idea appears to be that if the driver's Fourth Amendment rights have been legislatively waived, there can be no punishment consequent upon the exercise of a constitutional right because it has already been relinquished, courtesy of Wis. Stat. § 343.305(2). Thus, when a driver refuses to provide a blood sample, he is not being punished for exercising a constitutional right, but for refusing a statutorily-authorized request for needed evidence. This Rube Goldberg-like convolution may or may not be sufficient to make it past the Fourth Amendment, *717 but the purpose of my concurrence is not to analyze this contraption's fidelity to the Constitution. My purpose here is only to describe how the statute functions, and explain why "implied consent" has nothing to do with the consent necessary to obtain a blood sample.
¶ 58. In sum, the court's opinion misstates how Wis. Stat. § 343.305 operates. "Implied consent" does not authorize an officer to take a blood sample. It only provides (questionable) cover for punishing a driver who refuses to authorize a blood test. To actually perform the test, the officer has to ask the driver's permission. And if the driver says "no," the "implied consent" provision does not step in to countermand his answer. So the court erred by imputing to this statutorily-deemed "consent" the power to authorize a blood test. It then built on that error by claiming this non-operational "consent" is constitutionally valid because it is given freely and voluntarily.
l — I I — I
¶ 59. It is a metaphysical impossibility for a driver to freely and voluntarily give "consent" implied by law. This is necessarily so because "consent" implied by law isn't given by the driver. If it is given by anyone, it is given by the legislature through the legal fiction of "deeming": "Any person who . . . drives or operates a motor vehicle upon the public highways of this state ... is deemed to have given consent. . . ." Wis. Stat. § 343.305(2). One only "deems" when the thing deemed did not really happen, but you intend to act as though it did. So it makes no sense to ask if the driver freely and voluntarily gave something he manifestly did not give in the first place.
f 60. And yet, the court asks anyway: "When we are asked to affirm a finding that consent was *718 given, whether express or implied, we also must determine whether the consent was voluntary." Majority op., ¶ 24 (emphasis added). It is true that a person's consent to a search is constitutionally valid only if he gives it freely and voluntarily.[7] However, even as the court asserts that express consent and "consent" implied by law are constitutionally fungible, its analysis proves its thesis is indefensible. A brief exploration of how we assay the voluntariness of a person's consent illustrates the meaninglessness of this standard in the context of "consent" implied by law.
f 61. We analyze a wealth of factors in determining whether an expression of consent meets the volun-tariness standard. Majority op., ¶¶[ 24-26. We ask, for example, whether the police used deception, or trickery, or misrepresentations to produce the consent. Artie, 327 Wis. 2d 392, f 33. We explore whether the authorities threatened the defendant. Id. Or intimidated him. Id. Or used food or sleep as leverage to prize out his consent. Id. We ask whether the officer and the circumstances were "congenial, non-threatening, and cooperative." Id. We want to know how the defendant responded to the search request. Id. We factor into our analysis the person's age. Id. And intelligence. Id. And education. Id. And his physical and emotional condition. Id. And whether he had prior experience with law enforcement. Id. And whether the police told him he need not consent. Id. This is, in full, an exhaustive inquiry into virtually every conceivable circumstance that could possibly have some bearing on whether the defendant's consent was the product of the State's influence, as opposed to the defendant's own will.
*719 f 62. And still we are not done. A defendant may-have said "yes," and he may have actually submitted to the search, but we still worry that his words and his conduct might not really reflect a free and voluntary expression of his will. So we say that just because a person acquiesces to a search doesn't mean that he was really consenting. "Consent is not voluntary if the state proves 'no more than acquiescence to a claim of lawful authority.'" Id,., ¶ 32 (quoting Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)).
¶ 63. Now we are almost done determining whether a person's express consent is enough to waive his Fourth Amendment rights. To ward against inadvertent waivers, we burden the State with the obligation to prove the consent was voluntarily and freely given. Id. All told, then, we test the sufficiency of express consent with a searching inquiry into everything that could have made the consent anything less than a product of the driver's uninhibited will, we disregard a person's actual submission to the search if it was nothing more than acquiescence to a claim of lawful authority, and we make it the State's responsibility to prove the driver gave his consent freely and voluntarily. So much for express consent; now it's time to look at the factors we use to determine whether an instance of "consent" implied by law meets this standard.
¶ 64. For "consent" implied by law, we ask whether the driver drove his car.
¶ 65. And that's it. If the court is right about "consent" implied by law, then we have no interest in what the driver said, thought, experienced, felt, or saw. Nor do we need consider whether the driver acquiesced to a police officer's claim of lawful authority. We aren't interested in any personal detail about the driver, such *720 as his age, intelligence, circumstances, or emotional state. The only thing we want to know is whether he was in the driver's seat. And that's exactly what the court said: "We conclude that Brar voluntarily, albeit impliedly, consented when he chose to drive on Wisconsin roads."
¶ 66. That single sentence comprises the entirety of the court's voluntariness analysis as it relates to "consent" implied by law. In truth, that's about as much as it could possibly have said because we really aren't interested in the driver at all when it comes to this type of consent. The driver is irrelevant to the question because he isn't the one who provided the consent — it was the legislature. If the driver drove, the consent inquiry ends before it begins because the legislature provided it 48 years ago when it adopted Wis. Stat. § 343.305. There is a vast chasm separating express consent from "consent" implied by law, as this brief diversion into the voluntariness standard illustrates. In reality, they have literally nothing in common. Which is understandable because, as discussed above, they perform entirely different functions.

>

I 67. The most likely reason the court fell into error is that it tangled up the concepts of express consent (that is, spoken or written consent), consent implied by conduct, and "consent" implied by law. If we could untie this knot and consider the nature and function of each concept independently of the others, I believe the errors would correct themselves.
¶ 68. The first step to untying a knot is carefully observing how it came to be. I begin, therefore, by identifying each time the court confounded the differ *721 ent types of consent. The knot began with the threads of express consent and "consent" implied by law, which the court started weaving together in its discussion of State v. Padley, 2014 WI App 65, 354 Wis. 2d 545, 849 N.W.2d 867. See Majority op., ¶¶ 19-20. Rejecting the court of appeals' proper attempt to keep the threads separate, the court twisted them together into one: "This reasoning implies a distinction between implied consent and consent that is sufficient under the Fourth Amendment. Such a distinction is incorrect as a matter of law." Majority op., ¶ 19 ("Statement 1"). Still responding to Padley, the court then introduced the thread of consent implied by conduct into the growing knot: "Stated more fully, and contrary to the court of appeals' reasoning in Padley, consent can manifest itself in a number of ways, including through conduct." Majority op., ¶ 20 ("Statement 2"). Express consent, of course, is something personal to the driver (as opposed to something "deemed" by the legislature), so the court's next step was to infuse the personal "granting" element of express consent into each of the other threads: "The use of the word 'implied' in the idiom 'implied consent' is merely descriptive of the way in which an individual gives consent. It is no less sufficient consent than consent given by other means." Id. ("Statement 3"). It then subsumed "consent" implied by law into consent implied by conduct by making the former just a particular manifestation of the latter: "An individual's consent given by virtue of driving on Wisconsin's roads, often referred to as implied consent, is one incarnation of consent by conduct." Id., ¶ 21 ("Statement 4"). Finally, it pointed to the knot and declared it was all one, and the one was sufficient to waive Fourth Amendment protections:
*722 Therefore, lest there be any doubt, consent by conduct or implication is constitutionally sufficient consent under the Fourth Amendment. We reject the notion that implied consent is a lesser form of consent. Implied consent is not a second-tier form of consent; it is well-established that consent under the Fourth Amendment can be implied through an individual's conduct.
Id., ¶ 23 ("Statement 5"). But it is not all one.
¶ 69. The second step to the untying project is disentangling express consent from "consent" implied by law. I have already done most of the foundational work (supra), and it appears this is the loosest strand in the weave. I will pull first on Statement 3: "The use of the word 'implied' in the idiom 'implied consent[1] is merely descriptive of the way in which an individual gives consent. It is no less sufficient consent than consent given by other means." The premise of this statement is that, whether we are considering express consent or "consent" implied by law, it is the driver giving consent. That, however, is not true— between the two, only the first comes from the driver. Which is why we pay such fastidious attention to him and the circumstances of his interaction with the police officer when we assay the voluntariness of his consent. But with "consent" implied by law, we give scant thought to the driver (as the court itself demonstrated) because he isn't the one who gives the consent; it is the legislature. So it is categorically untrue that "the word 'implied' in the idiom 'implied consent' is merely descriptive of the way in which an individual gives consent." The word "implied" is important because it tells us it is the legislature, not the individual, who is giving consent.
*723 ¶ 70. With that correction, express consent is almost free from the court's knot. It is held there only by the court's rebuke in Statement 1: Padley's "reasoning implies a distinction between implied consent and consent that is sufficient under the Fourth Amendment. Such a distinction is incorrect as a matter of law." The implied consent statute actually makes Pad-ley's distinction explicit. As described above, the Implied Consent Component will never result in authorization to perform a blood test on a conscious individual because there is no operational connection between it and the Test Authorization Component. A police officer must ask a driver's permission to conduct a blood test; the statute's "implied consent" cannot supply that authorization, nor was it designed to do so. Thus, the court's statement that the "distinction is incorrect as a matter of law" is itself incorrect as a matter of law. And with that, express consent is free of the knot.
¶ 71. The third step in untying the knot is separating consent implied by conduct from "consent" implied by law. The court's discussion bounced between the two as if they were the same thing. They are not. Consent implied by conduct is a recognition of how people interact with each other in real life. Sometimes an action, or a gesture, or a circumstance, is sufficiently expressive of a person's will that we can derive from that conduct definite and certain information. And when that information conveys consent to a search, we accept it for its intended meaning, so long as it meets the voluntariness standard. These principles are apparent from the very cases the court cited while muddling the two concepts. I will address enough of them to demonstrate there is a real and critical difference between the concepts.
*724 ¶ 72. The court referred to State v. Tomlinson, in which we considered whether officers had received consent to enter a person's home. 2002 WI 91, 254 Wis. 2d 502, 648 N.W.2d 367. Two police officers approached the back door and knocked. A teenage girl answered, and the police informed her they were searching for the defendant and requested permission to enter. She then "turned to enter the house upon the officer's request to enter." Id., ¶ 37. We noted that the defendant "was present and apparently said nothing when this occurred." Id. We concluded that this conduct "could reasonably have been interpreted as an invitation to follow her inside." Id. That is, we carefully examined the conduct of the girl and the defendant to deduce what information it was conveying to the officers standing at the door. Because the conduct sufficiently conveyed a message of consent to the officers' entry, we gave it that effect and confirmed the search's constitutionality.
¶ 73. The court also cited United States v. Lakoskey, 462 F.3d 965 (8th Cir. 2006), as amended on reh'g (Oct. 31, 2006), which provides a counterfactual illustration of consent implied by conduct. There, a postal inspector was suspicious of a package, and so delivered it personally to the addressee. Id. at 968. The inspector met Mr. Lakoskey just outside the front door, and handed him the package. Id. When the inspector asked to see what was in the package, Mr. Lakoskey refused and walked inside the house. Id. After repeated requests, Mr. Lakoskey finally said he would open the package, but then turned so the inspector could not see it. Id. at 969. At that point, the inspector entered the house, Mr. Lakoskey opened the envelope, and incriminating evidence was disclosed. Id. The question before the court was whether Mr. Lakoskey's actions could *725 reasonably convey the message "you may enter my home" to the inspector. The district court said yes. Id. at 971. The Eighth Circuit disagreed. While recognizing that consent to a search can be implied from conduct, the court observed that "there is no indication in the record that he [Thomas Lakoskey] invited [Inspector] Hirose's entry, came outside to tell Hirose to follow him, left his door open, or motioned for Hirose to come in, implying that Hirose should follow him." Id. at 974. So the court concluded that "the finding of the district court that Thomas [Lakoskey] ⅛ actions constituted implied consent for Hirose to enter his home was clearly erroneous." Id.
¶ 74. The court also relied on Morgan v. United States, 323 F.3d 776, 778 (9th Cir. 2003), which held that "a warrantless search of a person seeking to enter a military base may be deemed reasonable based on the implied consent of the person searched." The Morgan court relied heavily on a Fourth Circuit case, which described how a person's conduct in such circumstances can convey the message "I consent to being searched":
[T]he validity of [the defendant's] search [did not] turn on whether he gave his express consent to search as a condition of entering the base. Consent is implied by the totality of all the circumstances. The barbed-wire fence, the security guards at the gate, the sign warning of the possibility of search, and a civilian's common-sense awareness of the nature of a military base — all these circumstances combine to puncture any reasonable expectations of privacy for a civilian who enters a closed military base.
Id., 781-82. (quoting United States v. Jenkins, 986 F.2d 76, 79 (4th Cir. 1993)).
*726 ¶ 75. Handing over one's luggage to be put through an x-ray scanner at an airport is also conduct conveying consent to a search, according to State v. Hanson, 34 P.3d 1, 5 (Haw. 2001), as amended (Nov. 7, 2001) ("Plainly, the surrender of one's effects at airport security checkpoints is to allow inspection of such effects for contents that may pose a danger to those on the aircraft."). And when an officer asks to search a bedroom, the meaning of the defendant's resulting conduct cannot be mistaken when he "opened the door to and walked into his bedroom, retrieved a small baggie of marijuana, handed the baggie to the agents, and pointed out a number of drug paraphernalia items." State v. Phillips, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998). We concluded the obvious: "The defendant's conduct provides a sufficient basis on which to find that the defendant consented to the search of his bedroom." Id. The court relied on both of these cases, too, and yet still did not perceive the difference between consent implied by conduct and "consent" implied by law.
f 76. There is a commonality to each of these cases, and indeed to all cases that find consent in a person's conduct: the information-conveying dynamic inherent to a game of Charades. When a defendant is supposed to have manifested his consent to a search by his conduct, we carefully watch as the State recreates the interaction between the officer and defendant. If the defendant's conduct in response to the request conveys the message "I agree to be searched," we give it that effect. There is no "deeming" involved. Just as in a game of Charades, we are trying to understand the actual, real-life information the person is conveying through his conduct at that moment.
*727 ¶ 77. And that unties the rest of the court's knot. In Statement 4 the court said "consent" implied by law is just a type of consent implied by conduct: "An individual's consent given by virtue of driving on Wisconsin's roads, often referred to as implied consent, is one incarnation of consent by conduct." If that is true, then there should be enough information bundled up in the act of "driving on Wisconsin's roads" for us to deduce an expression of the driver's will from that conduct.
¶ 78. Except there is not. There are a million things we might imagine driving a car might mean, very few that we can discern with any certainty, and none that say anything about consent to a search. We might conclude from observing a driver on the interstate that he is traveling from point A to point B. But even that simple inference is entirely speculative. Maybe he's out for a Sunday drive and he's travelling from Point A back to Point A. If he's traveling quickly we might infer he is in a hurry to get to his destination. But then again, maybe he just likes to drive fast. One could multiply examples without end, but in the end it would just emphasize what we already know. And that is that there are only two things we can confidently say that driving a car on Wisconsin's roads means: The driver is driving his car, and he is in Wisconsin. In a thousand attempts in a thousand games of Charades, no contestant will ever guess that driving a car in Wisconsin means "I consent to a blood test." It does no good to say the driver expresses such consent because the statute says he does. If one must resort to the statute books to discover the meaning of the driver's conduct, then the conduct has utterly failed to convey that meaning. Which is not at all surprising because *728 the statute does not purport to describe the meaning of driving on Wisconsin's roads, only its consequences.
¶ 79. Thus, neither the driver's conduct nor the statute can make driving in Wisconsin mean "I consent to a blood test." And that necessarily means that "consent" implied by law is not "one incarnation of consent by conduct." It then follows that Statement 2 — in which the court said consent can be derived from conduct — is true as a standalone description of the law, but irrelevant because this is not a "consent implied by conduct" case. Most of Statement 5 is true but irrelevant for the same reason — to the extent it says consent implied by conduct can be constitutionally sufficient, it is saying something inapplicable to this case.
f 80. Untying the knot isolates the court's error. In Statement 5, the court said "lest there be any doubt, consent by . . . implication is constitutionally sufficient consent under the Fourth Amendment." But without any support from the text of the statute, or the "consent by conduct" or "express consent" lines of cases, the statement is just ipse dixit. It is so because we say it is. And that contributes to an even more significant problem.
V
¶ 81. When the court says "consent" implied by law is just as constitutionally effective as express consent, it is saying something terribly chilling. It is saying the legislature may decide when the people of Wisconsin must surrender their constitutional rights. The court recognized that conducting a blood test constitutes a search within the meaning of the Fourth Amendment. It also recognized that such searches *729 require a warrant or a legitimate exception to the Fourth Amendment. And it further recognized that the exceptions usually will not apply.[8] The court dispensed with all of this, and announced that blood tests are always available when there is probable cause to believe someone was driving in Wisconsin while intoxicated. The scythe sharp enough to cut through all of these limitations turned out to be really quite simple, but no less surprising for that. The legislature simply had to declare that the people of Wisconsin had agreed to it.
¶ 82. If this is right, the Birchfield and McNeely[9] courts should probably feel a little sheepish for all the attention they paid to the constitutional niceties. Especially the Birchfield court, which lauded implied consent laws, but somehow missed our insight that they dispense with both the warrant requirement and the need to consider the known exceptions to the Fourth Amendment. "Consent" implied by law, our court says today, is no "second-tier form of consent." It is "constitutionally sufficient consent under the Fourth Amendment." The legislature need only say the people of Wisconsin waive their Fourth Amendment rights by driving, and immediately it is so.
¶ 83. A constitutional doctrine of this magnitude deserves considerably more attention than today's opinion gives it. One aspect of a more rigorous consideration would include developing and describing some limiting principles. Today the court says the legislature properly suspended Wisconsinites' Fourth *730 Amendment rights when they go for a drive. What of their Sixth Amendment rights? Perhaps the legislature might decide it would be easier to get convictions if they also suspend the right to the effective assistance of counsel. According to our opinion today, the legislature could simply declare that driving in Wisconsin waives that right, too. Or the right not to incriminate oneself. Or the right to a jury. What principle, exactly, would prevent any of this?
¶ 84. Nor is there anything about this new doctrine that necessarily limits it to the context of obtaining blood tests from intoxicated drivers. There are certain parts of the State that experience a disproportionate amount of crime. Perhaps the legislature might decide police need greater access to homes and other buildings in such areas. It could, according to our opinion today, adopt an "implied consent" statute in which recording a property deed comprises consent to a search of one's property when the police have probable cause to believe the owner has been involved in a crime. It takes very little imagination to see how this new doctrine could eat its way through all of our constitutional rights.
¶ 85. I understand the importance of pursuing intoxicated drivers. But we are deforming our Constitution. By conferring on the legislature the authority to create consent where none exists, we are reducing constitutional rights to matters of legislative grace. For all of these reasons, I join the court's mandate, but only so much of the opinion as discusses express consent.
¶ 86. I am authorized to state that Justice REBECCA GRASSL BRADLEY joins part I of this concurrence.

 When speaking of the implied consent provided by Wis. Stat. § 343.305(2), I will refer to" 'consent' implied by law." I do this to distinguish it from consent implied by conduct. And I put "consent" in quotes because, as I discuss infra, "consent" implied by law is not actually consent at all, and is incapable of authorizing a law enforcement officer to perform a blood test.

 All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

 The statute also provides for tests of a driver's breath or urine. But because a blood test is at issue in this case, I will refer only to that type of test.

 There is a connection between the Implied Consent Component and Test Authorization Component when the driver is unconscious. Wis. Stat. § 343.304(3)(b). That exception presents issues distinct from those presented by conscious drivers. Because Mr. Brar was conscious, I do not address the exception here.

 This subsection also provides for a "required" test when the operator is unconscious. But that is part of the exception I mentioned above. See supra n.4.

 Birchfield arose in the context of an implied consent statute (actually, several implied consent statutes, inasmuch as this opinion addressed defendants from multiple states). See Birchfield v. North Dakota, 579 U.S. _, 136 S. Ct. 2160, 2173 (2016). So if the legislatively-provided consent was sufficient to authorize a blood test, the Court would not have spent any time determining whether such tests are appropriate under the "search incident to arrest" exception to the Fourth Amendment. It would have simply noted the existence of an implied consent statute and called it a day. But it didn't, so *716 apparently the United States Supreme Court is not willing to trim the Fourth Amendment's protections as aggressively as we are.

 See State v. Artic, 2010 WI 83, ¶ 32, 327 Wis. 2d 392, 786 N.W.2d 430 ("The State bears the burden of proving that consent was given freely and voluntarily.").

 I am quite sure the court recognizes the limitations. It cited both McNeely and Birchfield, which together place substantial restrictions on when an officer may conduct a blood test without a warrant or consent.

 Missouri v. McNeely, 569 U.S. 141,133 S. Ct. 1552 (2013).

 The first opinion, authored by Chief Justice Patience D. Roggensack, is a lead opinion. The opinion is referred to as a lead opinion because it states the mandate agreed to by the majority of the justices but represents the reasoning of less than a majority of the participating justices.
Only Justice Annette K. Ziegler and Justice Michael J. Gableman join the lead opinion.
Writing in concurrence, Justice Rebecca G. Bradley concurs with the mandate and joins Part I of Justice Daniel Kelly's concurrence. Justice Daniel Kelly joins the "court's mandate and the opinion to the extent it discusses Mr. Brar's express consent to the blood test while he was present in the police station," but does not "join any part of the court's discussion of implied consent. ..." Justice Kelly's opinion, ¶ 1.
Thus five justices agree with the mandate set forth in the lead opinion; the mandate is that the decision of the court of appeals is affirmed.
Disagreeing with the mandate and the reasoning of the lead opinion, I write in dissent, joined by Justice Ann Walsh Bradley.
As Justice Ann Walsh Bradley recently explained in State v. Weber, 2016 WI 96, ¶ 83 n.1, 372 Wis. 2d 202, 887 N.W.2d 554 (Ann Walsh Bradley, J., dissenting), although "the term 'lead' opinion ... is undefined in our Internal Operating Procedures, its use here is consistent with past description. We have said 'that a lead opinion is one that states (and agrees with) the mandate of a majority of the justices, but represents the reasoning of less than a majority of the participating justices.'" (quoting State v. Lynch, 2016 WI 66, ¶ 143, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson & Ann Walsh Bradley, JJ., concurring in part and dissenting in part) (citing Hoffer Props., LLC v. DOT, 2016 WI 5, 366 Wis. 2d 372, 874 N.W.2d 533)).